Bank & Trust Co. v. Hotel Co.

UNION PLANTERS' BANK & TRUST COMPANY v. MEMPHIS
HOTEL COMPANY et al.*

'(Jackson.  April Term, 1911.)'

1. INJUNCTIONS. In effect requiring extension of smoke-
stacks is in reality a mandatory injunction, and will be re-
fused.

An injunction perpetually enjoining defendant from causing dense
smoke, cinders, soot, unconsumed gases, or noxious vapors to
issue from the chimneys or stacks of his building, "at an
elevation lower than the level of the roof of" complainant's
building, while not so in form, is in reality a mandatory
injunction, where its effect is to require the defendant to
extend his smokestack some fifty feet higher in the air, in
order to bring it on a level with the roof of the complainant's
building; and such injunction will not be granted. (Post, pp.
652-659.)

Cases cited and approved: Post v. Railroad, 103 Tenn., 184,
216; Hall v. Railroad, 12 Am. & Eng. R. R. Cas., 41.

2. SAME. Against smoke nuisances will not be granted where
against public policy, and the precedent would be intolerable;
case in judgment.

Where the complainant owned a fifteen story office building in the
heart of a city business district, and near the defendant's ten
story hotel, and the smoke, soot, and unconsumed gases, caused
by the soft coal burned in defendant's furnaces in such hotel,
were blown from defendant's smokestack against and into
complainant's building, in spite of defendant's care in firing,

*Extent and limits of power to abate nuisances, see note in 36
L. R. A., 599. Injunction against nuisances affecting health and
personal comfort, see note in 41 L. R. A., 322. Use of soft coal as
a nuisance, see note in 13 L. R. A. (N. S.), 465.

an injunction will not be granted against allowing the escape of smoke, etc., from the smokestack of defendant's building at an elevation less than that of complainant's roof, because there is not any known practicable way of permanently preventing the escape of smoke, etc., where soft coal is used as a fuel, and such injunction would amount to a mandatory injunction that defendant raise his smokestack to the level of complainant's roof; for the granting of such injunction would be an improper exercise of the court's discretion, as committing the court to a policy of elevating smokestacks at the suit of adjacent. owners, which might injuriously affect the public safety, and which would be almost impossible to adhere to consistently, and would establish an intolerable precedent. (*Post, pp.* 652-664.)

Cases cited and approved: Post v. Railroad, 103 Tenn., 184, 216; Madison v. Copper Co., 113 Tenn., 331-358; Gilbert v. Showerman, 23 Mich., 448; Hall v. Railroad, 12 Am. & Eng. R. R. Cas., 41.

3. **SAME. Chancery has no jurisdiction to award damages for injury to property involving unliquidated damages, where injunctive and all equitable relief is refused.**

Where injunctive and all other equitable relief is refused, the chancery court has no jurisdiction to award damages for injury to property involving unliquidated damages. This was the rule before Acts 1877, ch. 97, extending chancery jurisdiction, and this statute expressly excepts from the jurisdiction of chancery the cases of injury to property involving unliquidated damages; and chancery can only take jurisdiction of such matter as an incident to equitable relief granted. (*Post, pp.* 664-668.)

Code cited and construed: Sec. 6101 (S.); sec. 5035 (M. & V.); sec. 4292 (T. & S. and 1858).

Acts cited and construed: Acts 1877, ch. 97 (see Shannon's Code, sec. 6109).

Bank & Trust Co. v. Hotel Co.

Cases cited and approved: Marsh v. Haywood, 6 Humph., 210-213; Richi v. Brewing Co., 105 Tenn., 651; Mitchell v. Dowell, 105 U. S., 430; Kramer v. Cohn, 119 U. S., 356; Gamage v. Harris, 79 Me., 536; Cherokee Nation v. Railroad (D. C.), 33 Fed., 915.

Case cited and distinguished: Madison v. Copper Co., 113 Tenn., 331.

4. SAME. Same. Where injunction against a smoke nuisance is refused, chancery has no jurisdiction to award damages for injuries suffered; case in judgment.

Where the only equitable relief sought by bill in chancery, filed by the owner of an adjacent building, was that of an injunction to enjoin the defendant from allowing the escape of smoke from the smokestack in his adjacent hotel, and, in addition thereto, damages for injuries already suffered were sought to be recovered; and the injunctive relief was refused, the court had no jurisdiction to grant the relief for damages, because this jurisdiction could be exercised only as an incident to the grant of the injunctive relief. (*Post, pp.* 664-668.)

See citations under preceding headnote.

---

FROM SHELBY.

---

Appeal from the Chancery Court of Shelby County.— H. Dent Minor, Chancellor.

Sam Holloway and Robert Goodwin, for complainant.

Caruthers Ewing and Wright & Wright. for defendants.

MR. JUSTICE GREEN delivered the opinion of the Court.

The Union Planters' Bank & Trust Company, hereafter called the complainant, is the owner of a fifteen story building in the city of Memphis, known as the "Tennessee Trust Building." The ground floor and the half story above are used for the quarters of the bank, and the upper stories are devoted to office purposes. This building is located on the south side of Madison, between Main and Front streets, and runs back toward Monroe street on the south.

On the corner of Main and Monroe streets is located the Peabody Hotel, of which Mrs. Annie B. Snowden and the Memphis Hotel Company are respectively the owner and lessee. The front of the hotel is on the northwest corner of Main street and Monroe street, and is a building five stories high, known as the "old building." Just west of this old building is a new one, ten stories high, known as the "Peabody Annex." The Annex is almost due south from the Tennessee Trust Building; the nearest walls of these two buildings being about ninety-seven feet apart.

In the Anex is located a battery of boilers to supply heat, light, and power for the operation of the Peabody Hotel. The power thus generated is used to run the laundry machinery, dynamos, elevators, and for other ordinary purposes around the hotel. The boilers referred to are steam boilers, soft or bituminous coal being used in firing them, and for the escape of the smoke there is provided a smokestack running up on the west-

ern side of the Annex Building.    This smokestack is
made of cast-iron tiles and runs up a few feet above the
top of the Annex Building.   As before stated, the Annex
is a ten story building, and the Tennessee Trust Build-
ing is a fifteen story building.   The top of the smoke-
stack of the Annex is therefore about on a level with the
twelfth floor of the Tennessee Trust Building, and the
smokestack itself is about one hundred and forty feet
distant from the south wall of the later building.

The allegations of the bill are that in firing the boilers
in the Annex a large amount of dense black smoke is
generated, which, when the wind is in a southerly direc-
tion, is blown directly against the south wall of the Ten-
nessee Trust Building, soiling and blackening its walls,
entering the windows, and blackening and ruining the
inner walls and decorations; and it is averred by the
complainant that this smoke is driven into its building
in such quantities as to very seriously discommode its
tenants, and that they are threatening to leave and are
retained with difficulty.    Other injuries are stated as
the result of this smoke, and the complainant avers that
it has suffered a large financial loss, and is threatened
with an even greater one on this account, and it charges
the emission of this smoke, soot, etc., to constitute a con-
tinuing nuisance, and seeks an injunction to prevent or
restrain it.

The defendants answered, and admitted the location
of complainant's property and their property as charged
in the bill, and admitted the location of the smokestack

as stated, and that it did discharge smoke at intervals; but they insisted that no more smoke was thus made than was absolutely necessary in the proper operation of their plant, and they further stated that their appliances and equipment were up-to-date in every respect, and that skilled and competent engineers and firemen were in charge of their boilers and fires, with instructions to keep down the smoke as much as possible. They also stated that, as the result of a conference with the managers of complainant's building, a smoke consumer or device had been installed in their engine room, and that it had been given a faithful trial, and, in short, that they had earnestly sought to remedy the evil complained of with all reasonable means in their power. Defendants averred also that complainant did itself operate boilers and had a smokestack upon its building, and that this smokestack gave out at times large quantities of dense smoke, and that, when the wind was in the north, and the atmosphere was damp and humid, and the smoke inclined to settle, said smoke coming from complainant's stack entered into the hotel building and blackened and injured its furnishings and incommoded its guests, and, in general, inflicted the same sort of damage upon defendants' property that complainant alleged it suffered from the hotel smokestack.

A great deal of proof was taken by both parties to this controversy, which we cannot undertake to review in this opinion, but all of which has been carefully considered. Upon the proof heard, the chancellor gave a

decree in favor of the complainant, granting the relief sought by it in a somewhat modified form.

The prayer of complainant's bill was as follows:

"The complainant prays the court to cause to be issued its writ of injunction, enjoining the defendants and their servants and employes, and the servants and employes of either of them, from causing dense smoke, soot, cinders, unconsumed gases, or noxious vapors to issue from the chimneys or stacks of the buildings known as the Peabody Hotel and Peabody Annex."

The chancellor decreed that defendants be perpetually enjoined from causing dense smoke, cinders, soot, unconsumed gases, or noxious vapors to issue from the chimneys or stacks of the building, known as the Peabody Hotel Annex, described in the pleadings, "at an elevation lower than the level of the roof of the Tennessee Trust Building."

The injunction awarded by the chancellor, while not so in form, is in reality a mandatory injunction. Its effect is to require the defendants to extend their smokestack some fifty feet higher into the air, in order to bring it on a level with the roof of the Tennessee Trust Building.

The question before us is as to the policy and propriety of the chancery court thus undertaking to regulate the smoke nuisance in the business districts of our large cities.

As a matter of course, there are only two ways in which the defendants can comply with the chancellor's

decree and operate their plant. They must either 'cease creating and releasing from their stack dense smoke, soot, cinders, unconsumed gases, or noxious vapors, or, if such smoke and gases are created and released by them, they must run their chimney or smokestack up to the level of the roof of the Tennessee Trust Building. As to the first alternative, it is not insisted that the defendants should be restrained from operating the hotel, nor is it insisted that they have not a right to use their boilers in connection with the operation of their hotel. It is not even urged that they should be required to use any fuel different from the kind which they now use. Complainant could make no such insistence as this, for the proof shows that in its own plant it uses the same character of fuel that defendants use, namely, bituminous or soft coal. Complainant does insist that defendants install some device to abate their smoke, or else do so by more careful firing.

After a careful examination of this record, we are in grave doubt as to whether there is any device which could be attached to or used in connection with defendants' boilers which would consume and do away with the smoke, cinders, and gases there generated to any beneficial extent. In other words, we are not convinced, from the proof before us, that any such thing as a practicable smoke consumer has yet been constructed and put into use. There is some evidence indicating that devices of this character have been installed and used successfully for a time; but there is no satisfactory showing that there is anything on the market or to be

had which for a considerable length of time, when used in connection with boilers burning soft coal, to any extent continues to eradicate and do away with the resulting smoke, soot, cinders, etc. In fact, it is not pretended that there is anything of the kind which attempts or proposes to eliminate the gases or vapors released by the combustion of soft coal, and the prayer of the bill and the decree of the chancellor are directed alike against smoke, soot, cinders, and unconsumed gases or vapors. There is no satisfactory proof that defendants are negligent, or use other than ordinary and careful methods, in firing their boilers, and we are of opinion that the court would not be warranted in making an order upon defendants to adopt any particular plan or system of keeping up their fires.

We are also of opinion that the court would not be justified in ordering the defendants to install or adopt any particular kind of smoke consumer or like device. There is no sufficient showing that with any of them the proper result could be obtained for any length of time. The chancellor evidently reached the same conclusion that we do as to these matters, and, therefore, believing that complainant was entitled to relief, he sought to give it by pronouncing the decree heretofore set out.

In view of what we have said, it is plainly apparent that the decree below is just what we have heretofore indicated—a mandatory injunction, requiring the defendants to extend their smokestack fifty feet higher into the air.

This court has said:

"The rule is that a mandatory injunction, such as is asked for in this case, will not be granted, except in extreme cases and when courts of law are unable to afford adequate redress, or when the injury complained of cannot be compensated in damages." *Post* v. *Railroad*, 103 Tenn., 184, 216, 52 S. W., 301, 309, 55 L. R. A., 481, citing Gibson's Suits in Chancery, pp. 784-806; 1 High on Inj., p. 3; 3 Pom. Eq. Jur., p. 1359; *Hall* v. *Railroad Co.*, 12 Am. and Eng. R. R. Cas., 41.

There can be no doubt, upon the proof before us, that complainant has sustained injury by reason of the operation of the plant of the defendants. Nevertheless it does not appear that defendants have conducted these operations in an unusual or negligent manner. The proof indicates that they have employed skilled help in their boiler room and that they have manifested at all times a disposition to reduce the quantity of smoke emitted from their stacks by installing a smoke consumer and by instructions and warning to their fireman. It is also in evidence that smoke, being the result of imperfect combustion, is a dead loss of fuel, and that, therefore, it is to the interest of all persons operating boilers of this character to secure as far as possible perfect combustion and thereby utilize all their fuel. Self-interest, therefore, would prompt these defendants, and all others so situated, to reduce their smoke as much as possible, since their fuel bill is reduced accordingly.

On the question of running up this stack fifty feet higher, we could not rest easy in the conclusion that it

was safe and practical to make the attempt, on the evidence before us. Leaving out of consideration all question of the expense to the defendant thereby involved, we doubt the wisdom of such an effort in this case. This satck, as before stated, runs up along the west wall of the Peabody Annex. If we concede that the stack as it exists at present is of sufficient strength to support the downward crush weight of the extension, it is still manifest that there is no feasible way of supplying lateral support to resist the wind pressure for this additional stack. Certain methods are suggested by complainant's counsel, but they do not seem practical.

The extension of this stack would be about fifty feet high. If made metal corresponding with the other portion of the stack, it would weigh about five tons. It would be out of the question for a chancery court to order the erection of such a structure, high up in the air, in the heart of a city like this, with thousands of people passing near by daily, unless it was entirely manifest that this superstructure could be erected and maintained with entire safety. To say the least of it, the evidence in the record is conflicting on this proposition.

We cannot feel sure but that, if adopted, the chancellor's plan for remedying this particular nuisance might result in the creation of a much greater nuisance, that would be a greater menace to a greater number of people.

We prefer, however, to put our decision on a broader ground than the particular facts of this case which we have stated.

The annoyance and damage which complainant sustains from this smokestack is no doubt serious, but in undertaking to find a remedy we must consider the effects and results of that remedy. The situation existing between complainant's property and the defendants' property is by no means uncommon in any city. Such conditions are the rule rather than the exception. The buildings in none of our cities are of uniform height. All buildings in this day, which house any establishments of any considerable importance, are equipped with boilers, use coal, and make smoke. This smoke has to escape, and there must be smokestacks, and wherever one building is higher than another it will suffer from the smoke issuing from the stacks of the lower, unless some means could be devised whereby all stacks could be made a uniform height, and even this would not obviate the trouble, because of the tendency of smoke to descend in damp weather, and because of downward eddies in the air currents, which exist in the neighborhood of all high buildings.

The complainant in this case seems to suffer more than is ordinary. The difference between its damage, however, and the damage of any of its neighbors who have buildings higher than those adjoining, is only one of degree.

If the chancellor's decree were followed, it would commit the courts of this State to a policy that would prove embarrassing in the extreme. Any owner of a higher building could compel the adjacent owner of a lower

building to run a smokestack up to a point on a level with
the first owner's roof. The height of the extension de-
manded in this case is fifty feet, and we doubt if that
could be safely accomplished. Suppose that, instead of
being a fifteen story building, the Tennessee Trust
Building was thirty stories high. Upon the same princi-
ple, it could compel the extension of this Peabody stack
up to the level of a thirty story roof. Furthermore, both
of these buildings are docated in the heart of the city of
Memphis, as has been stated. A fifteen story building
is hardly the limit of the architectural development of
this section of the city. There will in time doubtless be
buildings erected in this immediate neighborhood much
higher than the Tennessee Trust Building or the Pea-
body Hotel. Upon the principle of the chancellor's de-
cree, if it were adopted, when these new buildings were
erected, they could compel the defendants to again extend
their smokestack into the air, and could compel the Ten-
nessee Trust Building to extend its smokestack, and so
this process might be repeated indefinitely. Under mod-
ern conditions and with the use of steel and modern
methods, there seems to be no limit to the height which
buildings may reach, and it would be extremely unwise
for the courts of the chancery of this State to inaugurate
a policy of requiring the smokestacks of our cities to be
put on a level.

We have stated the case strongly in the illustrations
above used, but we have not gone beyond the legitimate
result that follows the chancellor's decree. We are un-

willing to affirm this decree and make a precedent of this kind.

If such a policy of extending smokestacks should be attempted, the results would be unsightly as well as a menace to the community. There is no end to an undertaking of this sort, if once begun, and the evils resulting would be much greater than those sought to be remedied.

This court recently, in discussing the right to obtain an injunction against a nuisance, has said:

"But there is one other principle, which is of controlling influence in this department of the law, and in the light of which the foregoing principle must be weighed and applied. This is that the granting of an injunction is not a matter of absolute right, but rests in the sound discretion of the court, to be determined on a consideration of all the special circumstances of each case and the situation and surroundings of the parties, with a view to effect the ends of justice." *Madison* v. *Coppper Co.*, 113 Tenn., 331-358, 83 S. W., 658, 664.

To this we think must be added the observation that the rights, not only of the parties to the suit, but of the public generally, must be considered in all cases of this character. With reference to an application made for an order restraining the operation of a mill, which was alleged to be a nuisance by a neighbor resident, Judge Cooley said:

"We cannot shut our eyes to the obvious truth that, if the running of this mill can be enjoined, almost any manufactory, in any of our cities, can be enjoined upon

similar reasons. Some residents must be incommoded or annoyed by almost any of them. In the heaviest business quarters and among the most offensive trades of any city will be found persons who from motives of convenience, economy, or necessity, have taken up their abode; but, in the administration of equitable policy, the greater and more general interest must be regarded, rather than the inferior and special. The welfare of community cannot be otherwise subserved and its necessities provided for. Minor inconveniences must be rendered by actions for the recovery of damages, rather than the severe process of injunction." *Gilbert* v. *Showerman*, 23 Mich., 448.

"The interests of the public are to be taken into consideration by the court, and when the issuance of an injunction will cause serious public inconvenience or loss, without a correspondingly great advantage to the complainant, no injunction will be granted. If the injunction would have the effect of greatly injuring or inconveniencing the public, it may be refused, even though, as against defendant, the complainant would be entitled to its issuance." 22 Cyc., 784.

As we have heretofore pointed out, the difference in complainant's injury from the injuries suffered by many other property owners in the business sections of our cities is only one degree, and, if the extension or elevation of this smokestack could be ordered, numbers of other smokestacks could be likewise dealt with at the suit of adjacent property owners.

While every application for an injunction is acted up-
on with reference to the facts of the particular case, still
the facts of this case are identical with the facts of nu-
merous other cases existing in all our cities, and, were
the chancellor's decree affirmed, there would be no con-
sistent way to deny like relief in these other cases. The
result would prove dangerous to the community in many
cases, if, indeed, it did not in this case. The precedent
would be intolerable.

The smoke nuisance is one of the most serious prob-
lems with which our cities have to contend. What its
solution is we do not know, but we are clearly of opinion
that in congested quarters of our cities, where everybody
is more or less an offender, courts of equity should not
endeavor to solve this problem by the writ of injunction.
None of the parties are innocent, and their rights are too
doubtful, the solution of the problem is too obscure, and
the interests too extensive, to justify the chancery court
in making experiments with injunctions.

It is insisted by the complainant that, if not allowed
an injunction in this case, it should at least be
allowed a recovery for damages already suffered by its
property. In addition to the injunction sought, the com-
plainant, in its bill, prayed for a reference to ascertain
damages previously sustained, and for a decree for the
amount thereof.

Chapter 97 of the Acts of 1877 excepts from the juris-
diction of the chancery court cases of injury to property
involving unliquidated damages. The chancery court

obviously would have had no jurisdiction to determine this claim for damages, had it been presented alone. Such jurisdiction could have been acquired only as an incident to the main relief sought, to wit, the injunction. Taking jurisdiction for the purpose of injunction, the chancery court could have determined the entire controversy. *Richi* v. *Chattanooga Brewing Co.,* 105 Tenn., 651, 58 S. W., 646, and cases cited.

The weight of authority, however, is that even though "the bill states matter within the equity jurisdiction, but plaintiff fails to establish such equity, the rule is that the bill must be dismissed, and cannot be retained for the purpose of allowing legal relief to which plaintiff has shown himself entitled." 16 Cyc., 111. See cases in note 80.

The supreme court of the United States has observed: "The rule is that where a cause of action cognizable at law is entertained in equity, on the ground of some equitable relief sought by the bill, which it turns out cannot, for defect of proof or other reason, be granted, the court is without jurisdiction to proceed further, and should dismiss the bill and remit the cause to a court of law." *Mitchell* v. *Dowell,* 105 U. S., 430, 26 L. Ed., 1142, citing authorities.

This statement of the rule is approved in *Kramer* v. *Cohn,* 119 U. S., 356, 7 Sup. Ct., 277, 30 L. Ed., 440. See, also, *Gamage* v. *Harris,* 79 Me., 536, 11 Atl., 422, and *Cherokee Nation* v. *Sou. Kan. Ry.* (D. C.), 33 Fed., 915. In the case last cited the court dismissed the suit upon the failure of the prayer for injunction.

This court has observed:

"When the jurisdiction fails, all the power of the court also fails, except to give judgment for costs." *Marsh* v. *Haywood*, 6 Humph., 210-213.

The inability of equity to afford such incidental relief, where the sole ground of equitable jurisdiction fails, is recognized by Code, sec. 4292 (Shannon's Compilation, sec. 6101), providing that in a creditor's suit to set aside a fraudulent conveyance, the chancery court may render judgment on a claim, even though complainant fails to establish the fraud.

In the absence of this statute, the chancery court, prior to the act of 1877, would have had no jurisdiction in such a case to render judgment for the debt, in a suit where fraud, the ground of equitable cognizance, was not established.

W think for a stronger reason, since the act of 1877, a chancery court cannot proceed in matters, jurisdiction of which is expressly denied it, except where such matters arise in a suit that, for other matters therein contained and established, may be entertained in chancery.

There is nothing contrary to the view here expressed in the case of *Madison* v. *Copper Co.,* 113 Tenn., 331, 83 S. W., 658. In that case an injunction and damages were sought against the Copper Company, the operation of whose plant had been adjudged by a previous decision of this court to be a nuisance.

The court declined to grant the injunction sued for; but there was another distinct ground of equitable cog-

nizance, upon which the jurisdiction of the court rested. It appeared that the properties of the Copper Company were covered by a mortgage, and consequently could not be reached except through the aid of a court of equity, and it further appeared that the court did not altogether deny the injunctive relief prayed for. The court retained the case, allowing the defendant the alternative of executing bond to cover any damage, for which it might be adjudged to be liable, in default of which bond the injunction was ordered to be issued as prayed. Having sustained its jurisdiction upon the equitable grounds named, it was, of course, proper in that case for the chancery court to administer the incidental relief of determining and assessing damages.

As seen before, however, the only ground for equitable interference in this case has completely failed, and the chancery court has no jurisdiction under such circumstances to determine mere matters of unliquidated damage to property.

Although in this opinion we have recognized the fact that the complainant's property has been damaged, we did not mean to express the opinion that the injury, under the circumstances of the case, was one for which a recovery could be had. That question is left open.

The complainant's remedy at law is unembarrassed, and it may there obtain all the compensation to which it is entitled.

We therefore must remit this complainant to its suit at law for the recovery of any damages to which it may

be adjudged to be entitled, and we must disapprove the experiment which the chancellor attempted in its behalf by injunction in this case.

The decree of the chancellor will be reversed, and the bill dismissed, at complainant's cost.

## ON REHEARING.

In response to a very forceful and courteous petition to rehear, we may observe that the former opinion filed herein was perhaps not so full on the questions raised in the petition as it should have been. We have, therefore, made some additions to the original draft of the opinion herein which cover the questions of law raised in the petition to rehear. Upon the facts, with all due deference to learned counsel, we must adhere to our original conclusions.

We did not undertake to say in the opinion filed that there was no evidence indicating that smoke consumers existed and had been used with success; but we expressed the belief that such devices had not passed the experimental stage, according to the lights before us. In other words, while a smoke consumer might be installed which would prove successful for a time, we doubted if any had yet been devised which would *continue* after considerable use to accomplish its purpose.

We reviewed the facts of this case fully in our former opinion, and a reconsideration does not shake our confidence in the justice of our conclusions.

The petition to rehear must therefore be dismissed.