## Land Title and Trust Company v. Franklin National Bank.

*Building law — Office buildings of different heights — Smoke nuisance — Injunction.*

1. To entitle a plaintiff to an injunction, he must make out a plain case of injury and damage. If the injury be doubtful, eventual or contingent, equity will not interfere by injunction.

2. Where both parties are making the same use of their land, neither can complain of inconvenience or discomfort from the use by the other of his land, if in such use he is free from negligence or malice.

3. Where the maintenance of a smoke-stack by defendant is necessary for the combustion of fuel in the conduct of its office building, proper equipment is installed, proper fuel used, competent employees employed, and the building is in the immediate vicinity of others of a similar character, the emission of smoke and gases being an unavoidable consequence of its operation, plaintiff, maintaining a similar office building in the vicinity, is not entitled to an injunction restraining defendant from maintaining the smoke-stack as a nuisance, nor can plaintiff require defendant to increase the height of its stack from 58 to 100 feet above its roof so as to emit the smoke above the roof of plaintiff's building, when the experts called by the parties differ as to whether such remedy is feasible and whether, if constructed, a stack of the height required would not be a public danger to neighboring buildings.

4. Under such circumstances the defendant is using its land in a lawful manner and for lawful purposes.

5. Plaintiff using its land as an office building, its right thereto is subject to the smoky and dirty conditions caused by other office buildings in the neighborhood, and such conditions are not the subject of injunction.

Bill, answer, replication and proofs. C. P. No. 1, Phila. Co., March T., 1921, No. 8118, in Equity.

*Saul, Ewing, Remick & Saul*, for plaintiff.

*William A. Schnader*, for defendant.

BARTLETT, J., Sept. 22, 1922.—. . . Upon the pleadings and testimony we find the following

### Facts.

1. The plaintiff, Land Title and Trust Company, a Pennsylvania corporation, owns the property on the west side of Broad Street, between Chestnut and Sansom Streets, in the City of Philadelphia. The property extends west on Chestnut Street 100 feet, thence southerly about 90 feet, thence westerly 20 feet, thence southerly to Sansom Street at a point 120 feet west of Broad Street.

2. On the northerly part of this property, *i. e.*, the Chestnut Street corner, the plaintiff, in 1897, erected a fifteen-story office building, known as the old Land Title Building. On the southerly part of the lot, *i. e.*, the Sansom Street corner, there was erected, in 1902, an office building, known as the new Land Title Building. The new building occupies the property extending west on Sansom Street, 120 feet from Broad Street. The new building is 321 feet 7¾ inches high. On the west wall of the building, wholly upon plaintiff's premises, are a large number of windows.

3. The plaintiff and defendant each operates in connection with its banking institution a high office building. The plaintiff's building is on Broad Street, Philadelphia, extending from Chestnut Street to Sansom Street. The Chestnut Street end of plaintiff's building is sixteen stories high; the Sansom Street end twenty-three stories high. Defendant's building is on Chestnut Street, 54 feet west of plaintiff's building, and extends from Chestnut Street to Sansom Street. The Chestnut Street end of the building is one story high; the

Sansom Street eighteen stories high. Between plaintiff's and defendant's building is a two-story moving-picture theatre.

4. The defendant, the Franklin National Bank, owns the property situated on the south side of Chestnut Street, at a distance of 174 feet west of Broad Street; containing in front or breadth on Chestnut Street 54 feet, and extending southward to Sansom Street, keeping the same breadth between lines parallel with Broad Street.

5. On this property the defendant, in 1916, erected a building, of which the front part, on Chestnut Street, is one story high, and the rear part, on Sansom Street, is eighteen stories high. The Sansom Street building is 275 feet high. The defendant started its occupancy of this building in March, 1917.

6. Between the defendant's building and the new Land Title Building is a property 54 feet wide, formerly occupied by Kugler's restaurant, and now by a moving-picture theatre. The building is two stories high.

7. Immediately west of the defendant's building is the Crozer Building, which is ten stories high.

8. The top of the smoke-stack and the steam exhaust pipe of the Franklin Building are on the level of the twentieth story of the Land Title Building, and about 58 feet from it.

9. When the defendant built its eighteen-story building, it extended the stack of the Crozer Building to a point above the roof of its own building, that is, to a point on a level with the twentieth floor of the Land Title Building, and about 116 feet from it. The Crozer stack is carried on a framework of the Franklin Building.

10. When the wind blows from the west or southwest, and occasionally when it blows from the northwest, if the stack on the defendant's building is emitting gas or dirt, such gas or dirt is carried towards the plaintiff's twenty-three-story building, and if the windows are open, some of the gas or dirt is carried into certain of the offices on the higher floors of the building. Except when the wind is blowing from these directions, the gas or dirt from defendant's stack is not carried towards plaintiff's building.

11. When the wind blows from the west, southwest, and occasionally from the northwest, if the defendant's stack is emitting gas or dirt, such gas or dirt is carried toward the plaintiff's building, and, in some instances, has caused headaches, sore throats to employees of some of the tenants, and also deposits of dirt in the offices, but other buildings located to the south and west in the immediately vicinity, when operating their stacks, do the same.

12. Complaints of the dirt and dust have been made by some of the tenants to the plaintiff, but no tenant has removed from plaintiff's building as a result of the alleged nuisance; on the contrary, rentals have been materially increased, and no loss thereof was shown by the evidence on the part of the plaintiff.

13. When the wind blows from the northwest and southeast, smoke and dust is carried toward the plaintiff's building from other buildings in the vicinity, as shown by the testimony in this case.

14. The defendant's furnace and boiler equipment is modern in every respect.

15. There is no allegation or evidence either of negligence or malice in the operation of defendant's furnaces and boilers.

16. From the testimony, the only suggestion made by the plaintiff to the defendant for the purpose of lessening the annoyance to the plaintiff's tenants arising from the location of defendant's stack is, that the defendant

2 D. & C.

erect on the top of its building a steel stack approximately 100 feet high, in lieu of its present stack. Such a stack would extend to a point approximately 30 feet higher than plaintiff's twenty-three-story building.

17. From the testimony whether a stack such as plaintiff suggests would prevent the annoyance to plaintiff's tenants is a matter of conjecture and exceedingly doubtful. Air currents now carry the smoke and dirt from defendant's stack down several stories below the top of the stack.

18. A stack such as the plaintiff suggests could be stayed only by the use of guy-wires running from a point about one-third down from the top of the stack and fastened to the steel structure of the building.

19. A structure such as the plaintiff suggests would be extremely dangerous and hazardous, not only to the employees of the defendant, but also to the general public and adjoining buildings.

20. The safety of a structure such as the plaintiff suggests is doubtful.

## Discussion.

The plaintiff's twenty-two-story building was erected in 1902 at the northwest corner of Broad and Sansom Streets, and title thereto was taken by plaintiff on Dec. 31, 1919, from Sydney F. Tyler, surviving trustee of the Elkins-Widener estates.

In 1916 the defendant erected its office building on the southerly end of its lot, 174 feet west of the northwest corner of Broad and Sansom Streets, 54 feet west of the southwest corner of the plaintiff's building. This building is eighteen stories high and occupies but a portion of the lot, the front of said lot being occupied by its banking-rooms.

A two-story building between the plaintiff's building and the defendant's building is erected on a lot 54 feet wide and occupied by a moving-picture theatre.

On the top of defendant's eighteen-story building is erected a smoke-stack, necessary in size to carry on its business and the running of its plant, and it is equipped with all modern heating apparatus. The present stack on defendant's building is 58 feet from the Land Title Building and extends in height to about the ceiling of the twentieth floor of the plaintiff's building.

After the occupancy by the defendant of its building, when the wind is in a southerly or westerly direction, and defendant is operating its plant, smoke, gas and dirt are blown toward the plaintiff's building.

The plaintiff filed its bill to restrain the defendant, its officers and agents, from permitting any steam or sulphurous gases, soot, cinders and ashes to be emitted from the steam exhaust and smoke-stack on its premises at any point where they enter any of the offices of plaintiff's building.

Also asking for a decree requiring and directing the said defendant, its officers and agents, to cause to be erected upon its said premises such suitable smoke-stack or other construction as will carry the steam and sulphurous gases, soot, cinders and ashes from defendant's said premises to a point higher than the roof of plaintiff's building.

From the testimony in the case it appears from several witnesses called by the plaintiff and occupying floors above and below the stack on defendant's roof that when the wind is in certain directions, to wit, west, southwest or northwest, they are annoyed by gas, smoke and dirt emitted from defendant's smoke-stack.

It likewise appears from the testimony that some of the employees of tenants were physically affected at times.

From the testimony of other tenants on behalf of the defendant and occupying offices in the Land Title Building, it appears they suffer no more annoyance from the causes complained of than they do from the smoke and dirt of other buildings in the immediate vicinity, to wit, the North American Building, Girard Trust, Real Estate Trust Building on the east, the Lincoln Building, Penn Square, West End Trust, Morris Buildings and others.

It likewise appears from the testimony that the smoke-stack of the Crozer Building, immediately to the west of the defendant's property, is connected up with defendant's building.

From the testimony it further appears that in order to erect a stack sufficiently high to pass above the plaintiff's building, it would be necessary to add to the present stack of defendant a stack which would extend in all 100 feet above defendant's roof and held to a perpendicular by guys.

The testimony on behalf of plaintiff's experts was to the effect it could be done without any probable damage to defendant's building, and on behalf of the defendant it was testified it would be impracticable, with no assurance that the soot, etc., would not fall into plaintiff's premises, particularly when the atmosphere was heavy, and also to the effect that it was dangerous and a menace to the defendant's building and tenants, and also to the public.

The plaintiff's building and the defendant's building are located in the business centre of the city, surrounded by similar office buildings, hotels, clubs and the Pennsylvania Railroad Station and offices.

The questions raised are two-fold: (1) Can a court of equity, under the circumstances of this case, regulate the smoke nuisance in the business districts, where no negligence or malice is shown in the operation of the defendant's boilers and plant? (2) Would it be feasible to erect a stack 100 feet in the air, on the top of the roof of an eighteen-story building, as a remdy for the alleged nuisance?

As to the first proposition, it is contended by the plaintiff that it has the absolute right to pure air and light. This doctrine, under the common law of England, may be sound, but the courts of this country have never gone to the extent of the English courts.

As appears from the testimony, the equipment used by the defendant in its boiler and engine-room is most modern; the coal used is anthracite; and there is no evidence given or offered by the plaintiff that any other device could be used. There is no evidence of negligence, and the testimony further discloses the fact that defendant employs skilled help in its boiler-room; it further appears that the defendant and plaintiff have consulted with a view to remedy, if possible, the alleged nuisance. Therefore, we are of opinion that the trouble complained of is one of those incidental to a congested locality and from which we all, more or less, must suffer.

The annoyance of which plaintiff complains is no doubt serious. The situation between plaintiff's property and defendant's is by no means uncommon in any of our cities. Buildings are not of uniform height—the smoke must escape and high buildings must necessarily suffer from the smoke of lower buildings.

The plaintiff in this case seems to suffer more than necessary, but the difference between its damage and that of any of its neighbors who have buildings higher than those adjoining is only one of degree.

The plaintiff's property and defendant's property are in the same locality and both employed in the same manner, to wit, office buildings.

The plaintiff in this case has shown no injury or damage, and, as was said in Rhodes v. Dunbar, 57 Pa. 274, 286: "There must be injury and damage both

2 D. & C.

to justify the remedy by injunction: Campbell v. Scott, 11 Sim. 39;" and further on in the same opinion: "That a thing possibly may work injury to somebody is no ground for injunction. If the injury be doubtful, eventual or contingent, equity will not interfere by injunction. Shall the owner of property be deprived of its free and profitable uses altogether, it may be, because the light and air may not be as pure as a neighbor might desire? . . . These are annoyances as referred to in the proof, but are incident to a city residence."

See, also, Richards's Appeal, 57 Pa. 105. In this case the plaintiff sought to enjoin a defendant from using a certain kind of fuel in its business. The court held, inter alia: "A careful consideration of the testimony satisfies us that the use of semi-bituminous coal, the fuel complained of, is necessary to the successful manufacture of iron fit for axles, cannon and the like, in the manufacture of which the defendants are largely engaged; that the process of manufacture and fuel used are generally employed in similar establishments, and that there was neither a negligent nor wilful infliction of injury upon the plaintiff or his property in the defendants' mode of operating their works. Whatever of injury may have or shall result to his property from the defendants' works by reason of the nuisance complained of is such only as is incident to a lawful business conducted in the ordinary way and by no unusual means. Still, there may be injury to the plaintiff; but this of itself may not entitle him to the remedy he seeks. It may not, if ever so clearly established, be a case in which equity ought to enjoin the defendants in the use of a material necessary to the successful production of an article of such prime necessity as good iron, especially if it be very certain that a greater injury would ensue by enjoining than would result from a refusal to enjoin. If we were able with certainty to say that the use of semi-bituminous coal in the process of making good iron by the puddling process was unnecessary, and other fuel was equally good and available, or that by a reasonable expenditure of money on the work all injury might be avoided, a different case might appear to our minds as chancellors, and we might then say that the cause of injury should cease, and that a decree in terms to meet such a contingency should be made so as to prevent the injury."

Each case depends upon its own particular facts, and the case of Sullivan v. Jones & Laughlin Steel Co., 208 Pa. 540, relied on by the plaintiff in this case, does not, to our mind, control the facts of the case at bar. In that case plaintiff proved actual and substantial damage; in the case at bar there is no such proof.

It was also shown in the Jones case, by the use of certain appliances, the annoyance to the plaintiff might be appreciably diminished; in the case at bar nothing was shown except the doubtful proposition of extending the height of defendant's smoke-stack 100 feet.

From the above facts and authorities we are of opinion that no injunction can issue restraining the defendant in operating its building and furnaces therein contained in the manner in which it does.

The only remedy suggested by the plaintiff is the request that the chancellor enter a decree "requiring and directing the said defendant, its officers and agents, to cause to be erected upon its said premises such suitable smoke-stack or other construction as will carry the steam and sulphurous gases, soot, cinders and ashes from the defendant's said premises to a point higher than the roof of the plaintiff's building."

The testimony on this phase of the case discloses a serious contradiction. On behalf of the plaintiff it is contended that it could be done without probable

damage, and would mean an erection of a stack 100 feet in the air. The testimony, however, is not conclusive that this would be a complete remedy, as it was admitted that the smoke, gases, soot, etc., would fall on plaintiff's premises, dependent upon the atmospheric conditions.

On behalf of defendant the testimony shows that it would be dangerous to erect such a stack on defendant's building, as there was not sufficient room to guy it properly, and the stack and guy ropes would be subject to corrosion from the atmosphere, and it would be dangerous not only to the defendant's tenants and employees, but to the general public.

A case exactly in point is cited by the defendant, and the opinion of the court in that case is adopted with approval by us as being correct in law and principle as our view of the law upon the facts of the case at bar. See Union Planters' Bank and Trust Co. *v.* The Memphis Hotel Co. et al., 124 Tenn. 649 (1911). In that case the complainant was the owner of a fifteen-story office building. The defendant owned a hotel with a ten-story annex, in which power was generated for the hotel, and upon the roof of which was its smokestack, at a distance of about 94 feet from complainant's property.

A bill was filed by the complainant, as in the case at bar, alleging that in firing its boilers the defendant generated smoke, soot and gas, which, when the wind was in a southerly direction, was blown directly against complainant's building, soiling and blackening its walls, seriously incommoding its tenants, who threatened to leave, and who were retained with difficulty.

A decree was entered in the court below restraining defendant from operating its plant and discharging smoke, etc., at an elevation lower than the roof of complainant's building.

At the trial, the suggestion was made as to running up the stack on defendant's building 50 feet higher. Upon this point, in reversing the decree, *inter alia*, the court held:

"On the question of running up this stack 50 feet higher, we could not rest easy that it was safe and practical to make the attempt, on the evidence before us. Leaving out of consideration all question of the expense to the defendant thereby involved, we doubt the wisdom of such an effort in this case. This stack, as before stated, runs up along the west wall of the Peabody annex.

"If we concede that the stack, as it is at present, is of sufficient strength to support the downward crush weight of the extension, it is still manifest that there is no feasible way of applying lateral support to resist the wind pressure for this additional stack. Certain methods are suggested by complainant's counsel, but they do not seem practical.

"The extension of this stack would be about 50 feet high. If made of metal corresponding with the other portion of the stack, it would weigh about five tons. It would be out of the question for a chancery court to order the erection of such a structure, high up in the air, in the heart of a city like this, with thousands of people passing nearby daily, unless it was entirely manifest that this superstructure could be erected and maintained with entire safety. To say the least of it, the evidence in the record is conflicting on this proposition.

"We cannot feel assured that, if adopted, the chancellor's plan for remedying this particular nuisance might result in the creation of a much greater nuisance that would be a greater menace to a greater number of people.

"We prefer, however, to put our decision on a broader ground than the particular facts of this case which we have stated.

"The annoyance and damage which complainant sustains from this smokestack is no doubt serious, but in undertaking to find a remedy we must con-

2 D. & C.

sider the effects and results of that remedy. The situation existing between complainant's property and the defendant's property is by no means uncommon in any city. Such conditions are the rule rather than the exception. The buildings in none of our cities are of uniform height. All buildings in this day which house any establishment of any considerable importance are equipped with boilers, use coal and make smoke. This smoke has to escape, and there must be smoke-stacks, and wherever one building is higher than another, it will suffer from the smoke issuing from the stacks of the lower, unless some means could be devised whereby all stacks could be made a uniform height, and even this would not obviate the trouble, because of the tendency of smoke to descend in damp weather, and because of downward eddies in the air currents, which exist in the neighborhood of all high buildings.

"The complainant in this case seems to suffer more than is ordinary. The difference between its damage, however, and the damage of any of its neighbors who have buildings higher than those adjoining is only one of degree.

"If the chancellor's decree were followed, it would commit the courts of this state to a policy that would prove embarrassing in the extreme. Any owner of a higher building could compel the adjacent owner of a lower building to run a smoke-stack up to a point on a level with the first owner's roof. The heights of the extension demanded in this case is 50 feet, and we doubt if that could be safely accomplished.

"Suppose that, instead of being a fifteen-story building, the Tennessee Trust Building was thirty stories high. Upon the same principle, it could compel the extension of this Peabody stack up to the level of a thirty-story roof.

"Furthermore, both of these buildings are located in the heart of the City of Memphis, as has been stated. A fifteen-story building is hardly the limit of the architectural development of this section of the city. There will in time, doubtless, be buildings erected in this immediate neighborhood much higher than the Tennessee Trust Building or the Peabody Hotel. Upon the principle of the chancellor's decree, if it were adopted, when these new buildings were erected they could compel the defendants to again extend their smoke-stack into the air, and could compel the Tennessee Trust Building to extend its smoke-stack, and so this process might be repeated indefinitely.

"Under modern conditions and with the use of steel and modern methods, there seems to be no limit to the height which buildings may reach, and it would be extremely unwise for the courts of chancery of this state to inaugurate a policy of requiring the smoke-stacks of our cities to be put on a level.

"We have stated the case strongly in the illustrations above used, but we have not gone beyond the legitimate result that follows the chancellor's decree. We are unwilling to affirm this decree and make a precedent of this kind.

"If such a policy of extending smoke-stacks should be attempted, the results would be unsightly as well as a menace to the community. There is no end to an undertaking of this sort, if once begun, and the evils resulting would be much greater than those sought to be remedied.

"This court recently, in discussing the right to obtain an injunction against a nuisance, has said: 'But there is one other principle which is of controlling influence in this department of the law, and in the light of which the foregoing principle must be weighed and applied. This is that the granting of an injunction is not a matter of absolute right, but rests in the sound discretion of the court, to be determined on a consideration of all the special circumstances of each case and the situations and surroundings of the parties, with a view to effect the ends of justice: Madison *v.* Copper Co., 113 Tenn. 331.'

Land Title and Trust Company *v.* Franklin National Bank.

"To this we think must be added the observation that the rights, not only of the parties to the suit, but of the public generally, must be considered in all cases of this character. . . ."

The cases cited and relied upon by the plaintiff in the case at bar are all cases where either negligence or wilfulness in the operation of defendant's plants were the points involved and controlled the decisions, or damage and injury as a result of such operation was shown and proven, or it was shown that other and different methods could be employed in the operation of their plants.

For the above reasons and under the foregoing authorities, the prayer of the bill for an injunction is dismissed, at the cost of the plaintiff.

### Conclusions of law.

1. To entitle a plaintiff to an injunction, he must make out a plain case of injury and damage. If the injury be doubtful, eventual or contingent, equity will not interfere by injunction.

2. Where both parties are making identical uses of their land, neither can complain of inconvenience or discomfort caused by the other's use of his land, if in such use he is free from negligence and malice.

3. Where, as in the case at bar, the maintaining of a smoke-stack for the operation of its plant is a necessity for proper combustion, and where the proper equipment is installed, proper fuel used, competent employees employed and the plant is in the immediate vicinity of others of a similar character, the emission of smoke and gases being an unavoidable consequence of its operation, it is not a nuisance.

4. The defendant, under the facts in this case, is using its land in a lawful manner and for a lawful purpose, and is guilty neither of negligence or malice in the use thereof.

5. The plaintiff using and enjoying its land as an office building, its right thereto is subject to the smoky and dirty conditions that ordinarily and constantly come from other office buildings, and mere smoky and dirty conditions found in built-up neighborhoods are not the subject of injunction.

The bill is, therefore, dismissed in accordance with the findings of fact and conclusions of law. The plaintiff to pay the costs.

The prothonotary will notify the parties of the above findings in order that exceptions may be taken thereto within ten days.

NOTE.—Dec. 1, 1922, exceptions dismissed; no opinion filed. The requests for findings of fact and law and the answers thereto are omitted.