GEORGE T. WHITE, et al. v. N. C. & ST. L. RY.

Eastern Section.   July 25, 1925.

Certiorari denied by Supreme Court, December 19, 1925.

1. **Railroads.** Duty of railroad to elevate culvert to meet changed conditions and drain complainants' land.

In an action to recover damages for overflow and stagnant water caused by embankment and fill of defendant's railroad where the evidence showed that originally a culvert had been built through the fill which drained the land but the erosion of the soil had raised the land on both sides of the fill so that the culvert was stopped up and would not drain the land, but that the land on the lower side of the embankment was still lower than that above and but for the embankment would naturally drain it, held it was the duty of the railroad to construct a new culvert that would drain complainant's land and there was no duty on complainant to make a drain.

2. **Railroads.** Right to have water flow in its natural courses is a continuing right.

In an action to recover damages for overflow caused by defendant railroad's embankment or fill, held the complainants' right to have the water continue to flow in its natural drainage or course is a continuing right, and that the defendant's duty not to obstruct this natural flow or drainage is a continuing duty. In other words, it is just as much defendant's duty to maintain their railroad track in such a manner that it will not obstruct the natural drainage, as it was their duty in the first instance to so build it.

3. **Injunction. Complainant held entitled to a mandatory injunction to compel railroad to put in culvert to drain his land.**

Where a railroad had built a fill or embankment which stopped the natural drainage, but provided a culvert to take care of the water and in later years through natural causes the culvert was filled up and could no longer be made to drain complainant's land and the water collected there and destroyed the use of the land, and soured adjoining land and formed a breeding place for mosquitos, held a mandatory injunction would issue to compel defendant to put in a culvert to drain the land.

4. **Injunction. Mandatory injunction will be granted only in extraordinary case.**

A mandatory injunction will not be granted except in extraordinary cases and when courts of law are unable to afford adequate redress, or where the injury complained of cannot be compensated in damages.

5. **Injunctions. Granting of a mandatory injunction lies in discretion of the court.**

The issuance of such an injunction rests in the sound discretion of the court to be determined on a consideration of all the special circumstances of each and the situation and surroundings of the parties, with a view to effect the ends of justice.

Appeal from Chancery Court, Hamilton County; Hon. W. B. Garvin, Chancellor.

Affirmed.

Cantrell, Meacham and Moon, and White and White, all of Chattanooga, for George T. White, et al.

Brown and Spurlock, of Chattanooga, for N. C. & St. L. Ry.

THOMPSON, J.   The complainants in the year 1889 purchased, and still are the owners of, a farm, known as the Ellis Farm, which contains about two hundred fifty-three and one-half acres, and which lies in Hamilton county, Tennessee, about seven miles from the city of Chattanooga.

The defendants, Nashville, Chattanooga & St. Louis Railway and Western & Atlantic Rd. Company, as lessees from the State of Georgia, operate a line of railway from Atlanta, Georgia, to Chattanooga, Tennessee, the State of Georgia owning the railroad right-of-way, track, etc.

The railroad was originally constructed by the State of Georgia about the years 1850 to 1855.

This railroad runs through complainants' farm in a general northwardly and southwardly direction, but at the place in question, and going from Atlanta toward Chattanooga, it extends for about one-fourth of a mile from the Southeast to the Northwest. From high ground on the Southeast, the track is built on a fill or embankment, from twelve to twenty feet high, to high ground on the northwest. This embankment is on a curve, the inside of which is on the northeast side of the track.

This embankment or fill crosses a natural valley which extends from high ground northeast of the fill, to the Chickamauga Creek on the

southwest, there being rather high ridges at the upper end of this valley and of course high ground on either side of it. This long circular fill across the valley with high ground at each end makes a kind of ampitheatre or large basin on the northeast side of it and, of course, obstructs the natural flow of water which falls on the ridges and high ground at the upper end and sides of the valley, the natural drainage being down the valley and into the Chickamauga Creek which, as stated, is on the southwest side of the fill and a short distance therefrom.

To take care of this natural drainage, the State of Georgia, when it built the railroad, put a culvert under the fill at the lowest point and at the proper place. All the water from the upper valley and all the water on the upper side of the railroad right-of-way for a distance of three-fourths of a mile on both sides of the culvert, ran through the culvert to the southwest side of the fill and from there across complainants' land on the southwest side to the Chickamauga Creek. This culvert had two tubes each of which was two feet six and three-fourths inches wide, and two feet nine and three-fourths inches deep. The culvert from the upper end on the northeast to the lower end on the southwest had a fall of about ten or eleven inches, and at the time it was built the floor or bottom of the culvert was level with the floor or bottom of the valley and the culvert was sufficient in all respects to take care of the drainage at that time. At that time the land at the upper end of the valley was woodland, but since then and from time to time this woodland has been cleared. This has increased the drainage somewhat because rainwater runs off of cleared land faster than it does off woodland. However, the dimensions of the culvert, notwithstanding this increase in drainage, are still large enough to take care of the increased drainage without material damage to the land. The clearing of the land has also somewhat increased the erosion and washing of the soil of the higher land onto the lower end of the valley, although complainants have dug lateral ditches on the upper land to retard as much as possible this erosion or washing of the soil.

During the period of seventy-five or eighty years since the railroad was built the gradual erosion or washing of the soil from the higher land to the lower land has raised the bottom or floor of the valley three or four feet on both sides of the fill. The raising of the bottom or floor of the valley would have taken place had the fill not been built, but the raising on the upper or northeast side of the fill has been increased somewhat both on account of the building of the fill and the clearing of the higher ground at the upper end of the valley. The raising of the floor of the valley on the lower or southwest side of the fill has been caused both by the erosion or washing down of the soil from the upper end of the valley and by the over-

flows from Chickamauga Creek. However, the floor on the upper or northeast side of the fill is about one foot or possibly eighteen inches higher than the floor of the valley on the lower or southwest side of the fill, and if it were not for the fill or embankment the water would still flow down the valley just as it did prior to the building of the fill.

On account of the weight of the fill and the operation of heavy trains along the track on top of it, causing the culvert to settle somewhat, and on account of the raising of the floor of the valley the top of the culvert on the upper or northeast side of the fill is about a foot or a foot and a half lower than the floor of the valley on that side, and the top of the culvert on the lower or southwest side of the fill is about even with the floor of the valley on that side, or perhaps a little lower.

Notwithstanding this gradual pressing down of the culvert and this gradual raising of the floor of the valley the culvert took care of the drainage until the year 1919 when the flow of water began to be obstructed. This obstruction increased until it became practically complete during the year 1922. The result of the obstruction was to submerge several acres of complainants' land on the upper or northeast side of the fill causing complainants' considerable damage. The result of this obstruction is described in complainants' bill as follows:

"At no time during the past three years has the culvert been, even immediately following an attempt to open it, in such shape as to allow the waters to flow off as fast as they accumulate. Most of the time it remains completely sealed up, and there stands upon complainants' land, cleared, fertile and otherwise tillable, a pond of stagnant water, of varying extent, but usually from two to six acres, that sours the neighboring land, breeds mosquitos, and is such a nuisance as to cause general neighborhood complaint.

"Many times during 1920-21-22 and '23, in fact, every time there is a heavy rain there are recurring damages to complainants' lands due to the embankment with its stopped-up culvert backing the surface waters out over complainants' lands and crops. They are advised that they have a cause of action for each overflow, but for each overflow the damages would be hard to ascertain, give no permanent relief, and their collection by suit against a large and wealthy corporation would be expensive and annoying.

"The situation complained of is growing worse all the time, it amounts to a nuisance, both public and private, and recurs with every heavy rain or protracted wet spell. There can be no permanent relief except that the defendants enlarge and elevate their culvert so as to conform to the present level of the valley, and construct it of proper size and dimensions, according to good engineering prin-

ciples, to allow a free flow of the water that may reasonably be expected to fall upon the land that lies higher than the valley, and which must certainly and inevitably drain away thru the valley and under the embankment on its way to Chickamauga Creek.

"Since December 1, 1919, complainants have suffered damage in the manner pointed out to the extent of $1,000. They have repeatedly appealed to defendants for relief, personally and in writing, but to no avail."

The prayer of the bill, in addition, to a decree for damages, is for a mandatory injunction requiring defendants to abate and relieve the nuisance complained of by puting in a sufficient and proper culvert or other drainage way under said fill, so as not to dam up surface water upon complainants' land.

The proof shows that the standing of the water on five or six acres of complainants' land has not only prevented its use for raising crops but has killed the vegetation thereon and rendered it unfit even for pasturage purposes. Also, that the stagnant water and the decaying of the vegetation has soured some of the neighboring land and has bred mosquitos. It is not shown that complainants have any house or other building or operation on their farm near enough to be damaged by the overflow, but it is shown in a general way that the neighborhood is "thickly settled" and that on April 24, 1922, Mr. F. M. Cornelison, who lived somewhere near by, wrote complainants a letter protesting against this water standing on their land. How thickly settled the neighborhood is does not appear nor does it appear how many, if any, houses are near the point of obstruction, how far they are therefrom, etc. It does not appear how much complainants' land which is flooded is worth but complainants claim that they had already been damaged at the time of the filing of the bill to the extent of $500, and the defendants did not question this amount and, in fact, waived their right to have a reference on the question of the amount of the damages. However, some of the complainants' damages covered money which they had expended in an effort to relieve the flooded condition of their land. Neither does it appear how much it would cost defendants to raise the culvert so that its bottom would be even with the bottom or floor of the valley, except that in a letter from defendants' division engineer to complainants, exhibited with the record, it is stated that this would be a "very costly proposition."

As has already been stated, when the culvert first began to stop up, the overflow was only intermittent and did only slight damage, but this condition became worse until by the year 1922, the stoppage had become complete and the water stood upon complainants' land practically all of the time.

The defendants at times cleared out the culvert, or attempted to do so, and continued to make efforts to keep the culvert open at least as late as December 22, 1922, and in fact there is a letter, exhibited in the record, from the defendants' division engineer to one of their employees instructing him to make every effort to keep the culvert open. Beginning on April 10, 1922, the complainants began corresponding with the defendants about the situation, and this correspondence continued until July 6, 1923, which was less than a month prior to the filing of the bill. In this correspondence the defendants recognized the complainants' right not to have the drainage obstructed, but finally under the advice of their attorneys they took the position that instead of it being their duty to raise the culvert so that its floor would be level with the floor of the valley, it was the complainants' duty to dig a ditch leading from the lower end of the culvert to the Chickamauga Creek, the bottom of the ditch next to the culvert to be as deep as the bottom of the culvert and the ditch to have sufficient fall to permit the water to flow freely to the creek. Defendants contended and still contend that they could keep the upper end of the culvert open so that the water on this side of the fill could get into the culvert, and that if complainants would dig a ditch from the lower end of the culvert to the creek and have the bottom of the ditch as low as the bottom of the culvert, and with the proper flow, the culvert would not stop up. This ditch would not have to be constructed all of the way to the creek because there is a natural slue or drainway with deep banks extending from a point about one hundred and fifty yards from the lower end of the culvert to the creek and it would only be necessary to construct the ditch to the upper end of this drainway.

The complainants claim that since the floor of the valley on the upper side of the fill is still higher than' the floor of the valley on the lower side of the fill, and that therefore the water would continue to flow as it always had done if it were not for the fill, it is therefore, defendants' duty to raise the culvert so that its bottom would be as high as the floor of the valley. The defendants, on the other hand, contend that they could keep the upper end of the culvert open; that because the land on the lower side of the fill has raised above the floor of the culvert and stopped the flow of the water and causes the culvert to fill up with sand and gravel from the lower to the upper end, that it is complainants' duty to dig a ditch as deep as the floor of the culvert and extending from the lower end thereof to the creek, or to the slue or natural drainway, and with sufficient fall in the ditch to permit the water to flow away freely, and that if this was done the complainants' land would not be flooded. This is the point made by the pleadings and proof.

We think that if a ditch was dug and kept open sufficiently deep from the lower end of the culvert to the natural drainway, and if the upper end of the culvert was kept open by the defendants, the land might not be flooded. However, this does not clearly appear from complainants' evidence, and the defendants introduced no evidence. The correspondence shows that the complainants were willing to have this plan tried, provided defendants would dig the ditch, which defendants declined to do under the contention that on account of the decision of the Supreme Court in the case of Railroad v. Maxwell, 126 Tenn., 323, it was complainants' duty to dig and maintain this ditch.

The question for determination as made by the pleadings and proof is whether it is the defendants' duty to elevate the culvert, or the complainants' duty to dig the ditch, the defendants relying on Railroad v. Maxwell, supra, and the complainants on Davis v. L. & N. Rd. Co., 147 Tenn., 1. Neither of these cases are, in our opinion, really in point.

In Railroad v. Maxwell, supra, the land on the lower side of the fill had raised, but the land on the upper side had not, and the holding was that since the natural drainage had changed by the raising of the lower land so that it was no longer servient, therefore, it was not the duty of the defendant Railroad Company to dig a ditch through it so as to drain plaintiff's land on the upper side. The question of whether or not it was the defendants' duty to raise the culvert where the land had raised on both sides of the fill so that the water, if the fill were not there, would continue to flow as it had always done, was not-involved and was not passed upon, except that the court did say: "Was it the duty of the defendant in error (plaintiff) to maintain a ditch at all on his land south of (lower than) the railroad, or did he satisfy the law by merely permitting the water to flow from the higher land to the lower land? We are inclined to the view that the latter course would meet the requirements of the legal duty imposed on him."

The case of Davis v. L. & N. Ry. Co., supra, is not directly in point because in that case the raising of the land was due to the insufficiency of the defendants' culvert, and the question was as to when the twenty year period in which the railroad could acquire by prescription the right to flood the plaintiff's land began to run.

In the case before us the defendants had not acquired by prescription or otherwise the right to flood complainants' land, because defendants had, by the building and maintenance of the culvert and by the cleaning out thereof up to a short time prior to the institution of this suit, always recognized complainants' rights. Davis v. L. & N. Ry. Co., 147 Tenn., 1; Railroad v. Hays, 11 Lea, 382.

We think that as the land on both sides of the fill has risen from natural causes, and as the land on the upper side is still higher than the land on the lower side, so that the water would drain as it had always done if it were not for the fill, it is the defendants' duty to raise the culvert and the complainants were not bound to dig the ditch on the lower side of the fill. We think the complainants' right to have the water continue to flow in its natural drainage or course is a continuing right, and that the defendants' duty not to obstruct this natural flow or drainage, is a continuing duty. In other words, it is just as much defendants' duty to maintain their railroad track in such a manner that it will not obstruct the natural drainage, as it was their duty in the first instance to build it so that it would not do so. Certainly this would be true, where as in the instant case, the raising of the land on both sides of the fill was due to natural causes and not to steps taken by complainants.

In Davis v. L. & N. Ry. Co., supra, the Supreme Court said: "It is a well-settled rule of law in this state that lands lying at a lower level are burdened with the servitude of receiving all waters which naturally flow down to them from lands adjoining and upon a higher level, and this rule of law has been applied not only to living streams, but to surface water, and thereunder it is the duty of a railroad company in the construction and maintenance of its railroad to provide sufficient means for the safe passage of accumulated surface water."

Cases such as Railroad v. Higdom, 111 Tenn., 121, and Railroad v. Hays, 11 Lea, 382, Carriger v. Railroad Company, 7 Lea, 388, certainly indicate that the duty of maintaining the railroad in such manner as not to obstruct the natural drainage, is a continuing duty. In fact the very basis of the decisions allowing recurring damages, instead of permanent damages, is upon the theory that, where for instance, a culvert is insufficient or where there is no culvert, the defendant will not continue to maintain its road-bed in this condition but will remedy the same. See also, C. N. O. & T. P. Ry. Co. v. Roddy, 123 Tenn., 568.

In some of these cases the fill was constructed without any culvert and yet "recurring damages" only were allowed, upon the theory that the defendant would put in the necessary culverts so that the damage would not be permanent. How could only "recurring damages" be allowed if it was not defendants' duty to so maintain its railroad as not to obstruct the natural flow of water?

In view of our decisions, and the reasons underlying them, we think it was not complainants' duty to dig the ditch on the land Southwest of the fill. In this case the ditch would only have to be about one hundred and fifty yards long, but there might be cases where it would require a ditch very much longer. But the principle

is the same. We, therefore, find in favor of the complainants on this issue, and hold that under the facts of this case the complainants were entitled to recover damages from the defendants.

This brings us to the question of whether or not under the facts above shown, the complainants were entitled to a mandatory injunction, as provided in the decree of the lower court, requiring the defendants to "construct or cause to be constructed and maintained under, through and across said embankment crossing complainants' lands such an opening and passageway as will carry off all rain, surface and flowing water that by flowage reach the right-of-way of said railroad on complainants' lands and so as to prevent such waters being backed out over and upon complainants' premises and so as to prevent said waters standing on complainants' lands caused by said embankment and fill."

There is no discussion in defendants' brief and argument about the case not being a proper one for the issuance of the injunction in the event the court should be of opinion that it was not complainants' duty to ditch the land on the lower side of the fill or embankment. While the defendants' answers and assignments of error are broad enough to and do formally put the question in issue, yet on account of their failure to mention it in their brief, we would feel justified in not reviewing it if it were not for the fact that the jurisdiction of the chancery court over this entire case depends upon complainants' right to the mandatory injunction. The court took jurisdiction of the case purely upon the ground that the injunction was sought, and if it was not a proper case for the issuance of the injunction, and if the court had not in fact ordered its issuance, it would have lost jurisdiction entirely and could not have rendered the judgment for damages. This would be true even though the defendants had attempted to waive the question—which is one of the jurisdiction of the court over the subject-matter of the case. Shannon's Code, sections 6109 and 6131 and notes; Horton v. Mayor and Counsel, 4 Lea, 39; Bank v. Hotel Co., 16 Cates, 649; Swift v. Warehouse Co., 1 Thomp., 92; Railroad v. Flume & Transportation Co., 1 Thomp., 292; Fox v. Corbitt, 137 Tenn., 466.

Complainants cite in support of their right to have the injunction issued the following Tennessee cases: Caldwell v. Knott, 18 Tenn., 210; Vaughn v. Law, 20 Tenn., 123; Wall v. Cloud, 22 Tenn., 187; Clack v. White, 32 Tenn., 187; Brew v. Van Deman, 6 Heisk., 433; Lassater v. Garrett, 4th Baxt., 368. And also: Learned v. Hunt, 63 Miss., 373; Ferriss v. Wellborn, 64 Miss., 29; Earl v. De Hart, 12 N. J. Eq., 280; Masonic Temple Assn. v. Bank, 94 Va., 695; Ecton v. Lexington Ry. Co. (Ky.), 53 S. W. 522; 14 R. C. L., page 457, section 158.

It is true in the cases of Railroad v. Hays, 11 Lea, 382; Railroad v. Higdom, 3 Cates, 121; and Davis v. L. & N. Ry. Co., 147 Tenn., 1, the obstruction of drainage water, as in the instant case, is spoken of as a nuisance, but all of the Tennessee overflow cases which have been cited for complainants since the case of Lassiter v. Garrett, 4 Baxt., 368, and which was decided in 1874, have been actions at law to recover recurring damages and not suits in equity seeking an injunction. However, in view of the holding of the old cases cited by complainants, that whether the obstruction be considered as a public or private nuisance, a court of equity has jurisdiction upon the ground of its ability to give a more complete and perfect remedy than is attainable at law, to prevent nuisances by injunction, as well as to abate those already existing, and that the grounds of jurisdiction are the restraining of irreparable mischief, suppressive, oppressive and interminable litigation, or preventing multiplicity of suits, or where the mischief from the continuance or permanent character must occasion a constantly recurring grievance, which cannot be prevented otherwise than by injunction; and in view of what was said by the Supreme Court in Fox v. Corbitt, 137 Tenn., 466, with reference to overflow cases similar to the one under consideration, we think that the present case is a proper one for the issuance of the mandatory injunction requiring that the defendants "construct or cause to be constructed and maintained under, through and across said embankment crossing complainants' lands such an opening and passageway as will carry off all rain, surface and flowing water that by flowage reach the right-of-way of said railroad on complainants' lands and so as to prevent such waters being backed out over and upon complainants' premises, and so as to prevent said waters standing on complainants' lands caused by said embankment and fill."

It is true that this is a mandatory injunction and that under the holdings of the Supreme Court in Post v. Railroad, 103 Tenn., 184, and Bank & Trust Co. v. Hotel Co., 124 Tenn., 649, such an injunction "will not be granted except in extraordinary cases, and when courts of law are unable to afford adequate redress, or when the injury complained of cannot be compensated in damages. But these cases recognize that the issuance of such an injunction rests in the sound discretion of the court to be determined on a consideration of all the special circumstances of each case and the situation and surroundings of the parties, with a view to effect the ends of justice, and the case of Madison v. Copper Co., 113 Tenn., 331, is cited.

In the instant case the fill is a permanent structure, the present culvert cannot possibly carry the water, and unless the culvert is raised or a new one put in, the damages to complainants' lands, and the nuisance complained of, will continue and complainants will be deprived permanently of their lands. Since, under the law they can

only recover "recurring damages" they can never recover the entire value of their lands but will have to continue indefinitely to bring one suit after another, each seeking to recover the temporary damages up to the time of the institution thereof, they have no adequate remedy at law. We, therefore, think that the principles applied in the case of Ecton v. Lexington Ry. Co. (Ky.), 53 S. W., 523, are applicable to this case, and that the action of the chancellor in granting the mandatory injunction should be affirmed.

An order will be entered granting the mandatory injunction in language similar to that used in the lower court, but extending the time to December 1, 1925, and taxing the defendants with the costs of the cause. A decree will also be entered in favor of complainant for the sum of $500 damages, and interest from November 12, 1924, the date of the entry of the decree in the court below.

Snodgrass and Portrum, JJ., concur.