SLATTEN et al. v. MITCHELL et ux.—124 S. W. (2d) 310.

Middle Section.   July 23, 1938.

Petition for Certiorari Denied by Supreme Court, February 4, 1939.

548

S. G. Butler, of Sparta, and Lewis S. Pope, of Nashville, for appellants.

Camp & Camp, of Sparta, for appellees.

FAW, P. J. This cause was heretofore stricken from the docket of this court, after hearing oral argument of counsel, for the reason that it did not appear from the transcript filed here that an appeal had been granted by the Chancery Court; but in due season a petition for a rehearing was filed, accompanied by a duly certified supplemental transcript, from which it appears that an appeal had been granted to the defendants below, Joe Mitchell and wife, by the final decree of the Chancery Court, and that the failure of the transcript as originally filed here to so show was due to the failure of the Clerk & Master to copy a part of the decree into the transcript.

The petition of appellants is granted, and the cause will now be considered and disposed of on the record, assignments of error and briefs, and the oral argument heretofore heard as aforesaid.

W. W. Slatten and Quill Little brought this suit by original bill in the Chancery Court of White County, on May 11, 1936, against Joe Mitchell and his wife, Carrie Mitchell. All the parties are resident citizens of White County, Tennessee.

Complainants own and occupy, as tenants in common, a tract of land containing approximately 250 acres, situated in the neighbor-

hood in White County known as Hickory Valley, which lands they acquired by purchase on October 14, 1925.

Defendant Joe Mitchell is, and has been since the year of 1908, the owner and occupier of a tract of about 89 acres of land in Hickory Valley, lying immediately north of, and adjoining, a part of complainants' land.

Generally speaking, that part of the land of complainants which lies south of defendant's land is on a lower level than defendant's land. The lands of complainants and those of defendant lie on both the east and west sides of a public road, known as Hickory Valley Road, maintained by White County. It is inferable from the testimony of old men in the record that this road has been established and maintained on its present course for a period of time beyond the memory of the oldest men now living in its vicinity.

Two elevations, known, respectively, as Milk Sick Mountain and Haston's Ridge, lie north, northwest and northeast of Hickory Valley, and the general direction of the natural drainage of surface water through Hickory Valley is southward from the aforementioned elevations toward the lands of the parties to this suit.

Complainants allege in their bill that, for many years there have been a number of large sinks or sink holes on each side of said Hickory Valley Road and on defendant Mitchell's land, and the natural flow of the surface water over defendant's land and the Milk Sick Mountain watershed, has been to said holes—the water falling on the west side of said road going into the holes on that side of the road and the water running in the road and on the east side thereof going into the holes on the east side; that when there is any considerable rainfall an enormous amount of water falls upon this Milk Sick Mountain watershed, a very large portion of which flows over and across a portion of defendant's land and empties as aforesaid into said sinks, which sinks are adequate for taking care of all of said water, and that said sinks are the natural means of disposing of said surface water. It is further alleged in complainants' bill that, on the east side of said Hickory Valley Road and on land belonging to defendants and near the land belonging to complainants, the defendant has erected a large wall or dam from 3 to 4 feet in height, and around 150 feet in length; that said wall is built of chestnut logs, rocks, dirt, etc., of a very permanent nature and so situated as to block the flow of the water which naturally flows down the east side of the road, so as to prevent it from going into said sinks, and thereby causing all of said surface water to flow onto the land belonging to complainants, accumulating in the best bottom lands belonging to complainants, except that there has been left in said dam a small opening or gap about 3 feet wide which would, for a short length of time, carry a small portion of said water into said sinks; that there is a wire

fence across said 3 foot gap, which will, within a short time, catch a sufficient amount of trash, rubbish, etc., to entirely block the passage of said water, but, assuming that it does not become blocked or stopped up, it is much too small to accommodate the amount of surface water which has naturally flowed to such sinks during anything like a heavy rain.

It is further alleged in the bill that both of the complainants have talked to the defendant Joe Mitchell with reference to his conduct in constructing said dam and causing said water to flow over and stand on their land, and they have undertaken to reason with him and have asked him not to so erect said dam; that complainants talked to said defendant on Sunday, May 10, 1936, begging him to desist, when he told complainants, in emphatic terms, that he was going to go ahead and build the dam above referred to even higher than it now is, and that, in addition, he was going to erect another such dam on the west side of said road which would change the natural flow of the water on that side of the road, preventing it from flowing into the sinks above described as it naturally does, and stating in the conversation that he expected to "let the water go where it will;" that defendant did say at that time, however, that he expected to leave a small opening in each of said dams, but that he knew that they would not take care of all of the water and that he expected to have some help in taking care of same.

Complainants further allege that said sinks above referred to are the natural disposal plants, so to speak, of said surface water, and that if defendants are permitted to erect the barrier above described and maintain said dam or barrier, that said dams or barriers will work untold and irreparable injury to complainants; that the surface water which would thus be diverted and caused to flow upon complainants' lands would within a short time cause large ponds to develop on said land, there being no means of escape for said water, except that when one bottom would be filled the water would then flow over into another bottom, and on and on, forming another pond as the previous bottom is filled with water, until many acres of complainants' best farming land will be rendered useless; that defendants will, unless restrained by the court's writ of injunction, collect the rain water and surface water at the bottom of their lands so that it will pour in unnatural quantities upon the lands below belonging to complainants, to their great and irreparable injury and damage.

Complainants pray "that an injunction issue to restrain and prohibit the defendants from in any way adding to the dam or structure already erected and to restrain them, or their agents or servants, from erecting any sort of dam or barrier on the west side of the said Hickory Valley Road which would in any way divert

the natural flow of the rain and/or surface water as it now flows or would flow in case of rain; and that said dam or obstruction already erected be declared a nuisance and abated by the Sheriff at the defendants' expense;'' and complainants pray for general relief.

On May 26, 1936, complainants, by leave of the court, amended their bill ''so as to charge and aver that said sinks or sink holes described in the original bill have been present for more than twenty years next prior to the filing of the bill in this cause and having, during all of said time, been the natural disposal plants for the surface water falling upon the watershed described in the bill, and that for more than twenty years next prior to the filing of said bill the natural flow of the surface water on and over said watershed has been into said sinks.''

The defendants filed an answer to the complainants' bill in which they admit the ownership by complainants and defendants, respectively, of the lands so mentioned in the bill; but defendants deny that a large portion of the water that falls on Milk Sick Mountain watershed drains, according to the natural flow of the water, across their land, and they allege, on the other hand, that the water from a large territory, reaching for more than a mile in a northerly direction from their land, has been, from time to time, by other land owners and the road officials, diverted by ditches and otherwise so as to throw all of that large volume of water into the road ditches that run through the lands of defendants, and have diverted a large portion of this water from said road ditches into the fields of defendants lying on each side of said road, and to sink holes on the farm of defendants, until this drainage has become so heavy that said sink holes will not take all this water, which is causing heavy damage to the lands of defendants by other sinks coming in their most valuable bottom land; that this damage is not caused by the natural flow of the water, but by the diversion of the water that has, in years past, gone to other points or has been cared for otherwise.

Defendants admit that there have been a number of sinks on each side of said Hickory Valley Road, both on their land and on the land of complainants, but they allege that the natural flow of the water from the Milk Sick Mountain watershed had not been going to these sinks until same was diverted for some distance on each side of the road and thrown into the road ditches, which ditches have been kept open by the road authorities so as to drain all this water upon the land of defendants. Defendants state further that there is also a sink or cave in the ditch of the road, just north of their property, that would take considerable of said water if kept open, but that they have been unable, until the commencement of this suit, to get enough co-operation from the road author-

ities to even open up this sink so as to take its part of said water; and they further allege that said road dips in front of their property, but is permitted to rise near the south line of their property so as to confine all the water that falls in that neighborhood on their premises, rather than to let it follow the natural drainage; and defendants deny that the water described in the bill is surface water, and that the natural flow of said water would carry it to said sinks; and they deny that said sinks are the natural means of disposing of said surface water, or that said sinks are adequate to take care of all the water that has been turned into them; and defendants allege that the turning of this great amount of water into said sinks over the lands of defendants has caused other sinks to fall in and endanger the lives of defendants and their employees and of their livestock, and in greatly destroying the value of one of their best fields.

Defendants admit that, on the east side of said Hickory Valley Road, they have erected, or rather repaired and perhaps lengthened a wall or dam, if it should be called such, on their own land, inside their fence, and the height of said wall is approximately the same height as the roadway, but instead of leaving a small opening in said wall, they have left an opening of some 5 feet, for the full height of said wall, to take care of a large amount of the water that runs down said road; that the surface water never reaches said road in great amount; that the great amount of water that comes down the ditches along said road is water that is accumulated in other ditches for great distances and diverted into said road; that there is a wire fence along said road that crosses the opening in this wall, but same is an ordinary field fence and would not retard the flow of the water into said sinks; that this wall was built primarily to confine the water so that it will go into this sink at one place rather than to cover and wash away a great amount of defendants' land, and these ditches and openings will not become stopped up unless the road authorities become derelict in their duties; that defendants do not feel that any law or reason would require them to take care of all the water that falls within a radius of many miles, to their great injury, for the benefit of other land owners; that any water that might flow onto the lands of complainants on account of said wall would be water that would go on down said road, and would then have to go over a wall in order to reach complainants, and would then go on into a small bottom that has, not so many years since, been a pond, and is known as the old saw mill place, where there is an opening of some kind that caused said pond to sink; that if this place on complainants' land were kept open, as they are undertaking to require defendants to do, this opening would take care of this water and, if some should

run across the road at this point, complainants have some sinks on their land that would perhaps take care of this surplus water.

Defendants further allege that they have a legal right to erect walls or dams along their fences so as to prevent a great amount of water from running out of the road onto and over their land; that they are advised that there is no law or reason that would require them to take care of the water that may have been ditched onto their property; that they are perfectly willing to take care of the natural flow of water that falls on or runs over their land, but all the water complained of in the bill in this cause is water that is directed to defendants' land by ditches, and they insist that they are within their rights in saying that they would let the water go where it would, rather than let it be ditched upon their premises; that the road hands have often gone upon the premises of defendants and undertaken to deepen ditches in order to force the water on them.

Defendants deny that the sinks on their lands, referred to in the bill, are natural disposal plants, or that the erection of the barriers or dams referred to will in any way change the natural flow of the water; that complainants have the same natural means of disposing of this water as have defendants, and, if this be not the case, it would not be the fault of defendants, but the fault of the party or parties that have from time to time been permitted to ditch all the water from the countryside to this Hickory Valley Road, and then the road authorities to continue to ditch same down the road to the property of defendants, and then undertake to stop said ditches before the water reaches the bottom of the hill so as to protect the complainants and to cause rapid and continuous damage and injury to the property of the defendants. Defendants deny that the complainants have any grounds for injunctive relief or for any relief against the defendants.

A temporary injunction, as prayed for in the bill, issued pursuant to a fiat of the Chancellor, granted on preliminary exparte application.

The parties, through their solicitors of record, entered into a written agreement, filed as a part of the record, that "this cause be tried upon oral and documentary testimony before the Chancellor under and in accordance with the Public Acts of 1917, chapter 119;" and the cause was so tried, all of the eighteen witnesses examined, save one, testifying in open court before the Chancellor. The evidence was preserved for the record by bill of exceptions.

The Chancellor dictated to a reporter and (when transcribed) signed and filed his "opinion and finding of facts" which is summarized in his decree, later entered of record, as follows:

"1. That complainants are the owners of the lands described in the bill comprising 240 acres more or less, a certified copy of their

deed to which is filed in the record; that the defendants Joe Mitchell and wife Carrie Mitchell are the owners of a farm of about 80 acres adjacent to and immediately North of said lands, said defendants' lands lying on each side of what is known in the record as the Hickory Valley Road.

"That in the main defendants' lands are higher lands than that of complainants' but that there is a small natural rise or ridge in the said Hickory Valley Road at or near the boundary line between complainants and defendants; that there are natural sinks or sink holes both on the East and West side of said Hickory Valley Road, near said road and in lands of defendants;' that the proof conclusively shows that said sinks or sink holes in said bottoms belonging to said defendants are and have been for more than 30 years the natural disposal systems for the surface water which falls upon the hills and mountains on the lands of defendants' and lands to the Northward of the lands owned by complainants; that said road is the natural drain for said mountain and hill sides and that said water's natural flow is down said road and road ditches, and out of said road ditches and into the said sinks located on both sides of said road and several feet lower than said road and road ditches; that the said surface water had not flown across the rise above referred to and onto the lands owned by complainants for a number of years prior to the erection of the wall or dam in question in this suit, and that the natural flow of said surface water has never been onto the lands of complainants' but has been into the sinks or sink holes above referred to on said Mitchell lands; that said sinks or sink holes are adequate and sufficient for disposing of all the surface water which has flowed to and into them prior to the recent addition to said wall or dam.

"That said defendants have no legal or equitable right to obstruct or retard the flow of the surface water ·in the road and ditches of the Hickory Valley Road so as to cause same to flow over and on complainants' lands.

"2. It is, therefore, ordered that complainants' bill be and the same is hereby sustained, and the defendants Joe Mitchell and wife Carrie Mitchell, and their agents and/or servants are hereby forever and perpetually enjoined from in any way building or adding to the dam or wall erected by them on the East side of the said Hickory Valley Road, and also from building or erecting any sort of dam or barrier on the West side of said road which would in any way interfere with or change or retard the natural flow of the surface water as it flows down and in the ditches of said Hickory Valley Road and into the sinks or sink holes heretofore referred to.

"It appears from the proof that there is an opening some 5 feet in width in the dam or wall complained of on the East side of said

road, but that there is a wire fence across said opening. The Court is of the opinion that said hole probably will accommodate all of the surface water flowing down that side of said road provided said hole or opening is kept .open and not permitted to become clogged and obstructed by debris and rubbish of various kinds, but that if it is permitted to become so congested and stopped up it will not accommodate said water and said water will flow over onto complainants' lands.

"The said Joe Mitchell and wife Carrie Mitchell are therefore, hereby strictly enjoined, required and directed to keep said hole or opening open, free and unobstructed at all times so that said surface water will be allowed free and unobstructed passage through said opening at any and all times.

"As aforestated said defendants Joe Mitchell and wife Carrie Mitchell are not required by this decree to remove said wall or embankment, the Court being of the opinion that if said hole or opening referred to, if kept open and unobstructed, will accommodate the flow of said water except in the time of very unusual and excessive amount of rainfall when said surface water might possibly flow over said rise and on into and on complainants' lands. However, it is hereby expressly decreed and provided that this decree is made without prejudice to the rights of complainants or subsequent owners of said lands to institute proper proceedings seeking the elimination of said dam or barrier in case said dam or barrier causes surface water to flow over onto the lands in unnatural quantities, either on account of said dam or wall or on account of the failure of said defendants to keep the said opening in same free and unobstructed.

"Judgment is here entered against the defendants Joe Mitchell and wife Carrie Mitchell for the costs of this cause, for which execution may issue."

Through their assignments of error the appellants present a number of propositions upon which they rely for support of their assertion that the decree of the court below, so far as it is adverse to the appellants, is erroneous, and should be reversed, and the complainants' bill should be dismissed at their cost.

Without following the order in which they are assigned by appellants, we think the material and determinative propositions presented by the assignments of error are that the Chancellor erred:

(1) In finding that the water coming on defendants' premises, though diverted into channels and increased by draining ponds, etc., was the natural flow of the water.

(2) In finding that the sinks on the farm of defendants were the natural disposal places for the water, and that they were sufficient to take care of all the water that flowed down the Hickory Valley Road.

(3)   In finding that the erection of the wall in question was the cause of the overflow.

(4)   In finding that the natural flow of the water had never been on complainants' land.

(5)   In holding that the defendants did not have a right to build the wall in question or to erect other wall or dam.

(6)   In granting a mandatory order requiring the defendants to keep an opening in the wall or dam, clear and free from any obstruction.

We think the statements of the facts hereinbefore made, including that part of the findings of the Chancellor not challenged by the appellants' assignments of error, sufficiently disclose the background and setting of this case, and there is no need to repeat these facts further than they may be incidental to a discussion of the controverted facts.

It is seen that this case involves the disposition of surface water falling from the clouds in the form of rain or snow. There is no evidence that any of the waters in question have their source in springs or permanent streams or water courses.

The "common enemy" doctrine, "according to which, broadly stated, each land owner may fight off surface water and dispose of it as best he can" (27 R. C. L., pp. 1143-1145, sec. 74), does not obtain in this state. Garland v. Aurin, 103 Tenn. 555, 53 S. W., 940, 48 L. R. A., 862, 76 A. M. St. Rep., 699; Davis v. Louisville & N. R. R. Co., 147 Tenn., 1, 244 S. W., 483; Louisville & N. Railroad Co., v. Maxwell, 126 Tenn., 323, 148 S. W., 692; Railway Co. v. Mossman, 90 Tenn., 157, 16 S. W., 64, 25 Am. St. Rep., 670; Louisville & N. Railroad v. Hays, 11 Lea, 382, 47 Am. Rep., 291; Carriger v. Railroad Co., 7 Lea, 388; Burton v. Chattanooga, 7 Lea 739; White v. N. C. & St. L. Railway, 1 Tenn. App., 467; Wilson v. Louisville & N. R. R. Co., 12 Tenn. App., 327.

The rules approved by our Supreme Court, concerning the reciprocal rights and duties of adjacent land owners with respect to surface waters, are stated in Garland v. Aurin, supra, at pages 559, 560, 53 S. W., at page 941 (quoting from Addison on Torts), as follows:

" 'Land cannot be cultivated or enjoyed unless the springs which rise on the surface and the rains that fall thereon be allowed to make their escape through the adjoining and neighboring lands. All lands, therefore, are of necessity burdened with the servitude of receiving and discharging all waters which flow down to them from lands on a higher level; and if the owner or occupier of the lower lands interposes artificial impediments in the way of the natural flow of the water through or across his lands, and by so doing causes the higher lands to be flooded, he is responsible in damages for infringing the natural right of the possessor of such higher land

to the natural outflow and drainage of the soil, unless he has gained a right to pen back water by contract, grant, or prescription. So that if the proprietor of the higher lands alters the natural condition of his property, and collects the surface and rainwater together at the bottom of his estate and pours it in a concentrated form and in unnatural quantities upon the land below, he will be responsible for all damages thereof caused to the possessor of the lower lands.' "

It appears from an examination of the cases above cited that all of them involved the alleged obstruction of surface water by the proprietor of the lower land to the injury of the proprietor of the upper or higher land; and none of them involved an application of the rules governing the proprietor of the upper land with respect to his disposition of surface water. However, in several of these opinions the rule forbidding the proprietor of the higher land to alter the natural condition of his property so as to collect the surface water at the bottom of his estate and pour it in a concentrated form and unnatural quantities upon the land below, is stated (as quoted from Garland v. Aurin, supra) in the course of a statement of the reciprocal duties of adjacent land owners, and, although, in strictness, obiter dicta in those cases, we will treat it as the settled general rule in this State. This rule is, we think, a logical corollary of the rule adopted and applied in the cases above cited with respect to the obstruction of surface water by the proprietor of lower land to the injury of the proprietor of the upper or higher land.

But it does not follow from the rules we have stated that the proprietor may not protect his lands from the injurious effects of surface water, if, in thus relieving himself, he respects the rights of others. Burton v. Chattanooga, 7 Lea, 739, 741, 742.

"The owner of the higher land . . . has no right, even in the course of use and improvement of his land, to collect the surface water into a drain or ditch, increasing it in quantity or in a manner different from the natural flow upon the lower lands of another, to the injury of such lands:" Burton v. Chattanooga, supra, page 741; but the owner of the higher land has the right to protect his agricultural land by digging ditches along the natural depression or drainway, and he may build a wall for that purpose, provided he leaves an opening or culvert in the wall of sufficient capacity for the passage of the waters. See Note, 19 L. R. A. (N. S.), page 168.

Moreover, defendants are not responsible for injuries which may be sustained by complainants, caused by water diverted from its natural flow and into the road ditches by others for whose acts neither of the parties is responsible, and prevented by defendants' wall from entering his land; for defendants' land is subject to no servitude to receive surface water thus diverted to it. Higgins v.

Spear, Tex. Civ. App., 283 S. W., 584, affirmed by Texas Supreme Court, 118 Tex. 310, 15 S. W. (2d), 1010; Kauffman v. Griesemer, 26 Pa. 407, 67 Am. Dec., 437; Thomas v. Bunch, Tex. Civ. App., 41 S. W. (2d), 359, 363; Bunch v. Thomas, 121 Tex. 225, 49 S. W. (2d), 421, 424.

Bearing in mind the foregoing rules of law, we come to the consideration of the determinative facts of the case in hand.

We are unable to agree to the finding of the learned Chancellor that the Hickory Valley Road is "the natural drain" for the territory north of defendants' land in Hickory Valley. It is more than a half-mile from Milk Sick Mountain and Haston's Ridge to defendants' land, and the intervening land on both sides of the Hickory Valley Road is mainly cleared agricultural land. There are ditches on the farms on both sides of the Hickory Valley Road north of defendants' farm, which carry the surface water to the ditches in that road. There are ditches down another road from Haston's Ridge on the northeast which bring down a considerable volume of water that empties into the ditches of the Hickory Valley Road. A few years ago (date not definitely shown) a pond of considerable size on the farm north of defendants' land, known as the Jack Poore farm, was drained by ditching the water into the Hickory Valley Road ditches, and this ditch is still maintained and the water which formerly collected in this pond now flows into and down the ditches of the Hickory Valley Road to defendants' land.

The undisputed proof shows the existence of the aforesaid lateral ditches which carry the surface water to the Hickory Valley Road above defendants' land, and each of the complainants admitted in his testimony that at least a large part of the water flowing down the Hickory Valley Road ditches to defendants' land is brought into the Hickory Valley Road by said lateral ditches.

As a matter of common knowledge of the unobstructed movement of surface waters, we think it obvious that, but for the aforementioned lateral ditches, a great part of the water falling on the terrain in Hickory Valley north of defendants' land would be diffused over the surface, in part absorbed by the soil, in part drained off in different courses, and only a small part, as compared with the volume of water ditched into the Hickory Valley Road, would reach that road and flow down the ditches therein to defendants' land.

As before stated, land is not ordinarily subject to a servitude for the reception of surface waters thus diverted to it and poured upon it in concentrated form and unnatural quantities.

By their bill, as amended, complainants plead a prescriptive right to have all the surface water falling upon the watershed described in the bill flow into the sinks, or sink holes, on the land of the de-

fendants. It is, therefore, necessary to consider certain other facts disclosed by the record.

The flow of water in the Hickory Valley Road is southward, but a short distance north of defendants' south boundary line (and complainants' north boundary line) there is a sag in the road, and from the lowest point of this sag the grade of the road southward ascends gradually to the point where the boundary lines of the parties cross the road as above mentioned, from which point the grade again declines southward. The apex of this "rise" in the road is about 18 inches higher than the bottom of the aforementioned sag, and affords a sufficient obstruction to the water in the road to cause it at times to overflow the ditches, and, in the absence of a barrier, it would flood and "wash" the productive farm land of defendants over a considerable area in their fields adjacent to the road.

About twenty years before the trial below, defendant Joe Mitchell built a "wall," 117 feet in length, along the east side of the aforesaid sag in the Hickory Valley Road and, at the south end of this wall, dug a ditch across his field to carry the water from the road to a sink hole in said field several feet from the road. In building this wall, defendant "used chestnut logs and filled in next to the bank with crag rock." This wall was on defendants' land and immediately inside his wire fence. So far as appears, no complaint was ever made by complainants, or any one else, of the above mentioned wall, which is known in the record as the "old wall."

The construction of the "new wall," of which complaint is made in the bill in this case, was begun in 1935 and completed in the spring of 1936, shortly before the bill in this case was filed. It is of similar construction to the old wall, and extends southward, immediately inside defendants' wire fence, for a distance of 106 or 108 feet from a point 5 feet south of the southern end of the old wall; that is to say, defendant so constructed the new wall as to leave a gap, or opening, 5 feet wide between the south end of the old wall and north end of the new wall for the passage of water from the road ditches and thence to the sink hole in defendants' field.

On the occasion of a very heavy rain in the spring of 1936, shortly after defendant built his new wall, a low place in complainants' bottom field east of the Hickory Valley Road and immediately south of defendants' south field, was flooded. The proof shows that some years before complainants bought the farm they now occupy, there was a pond covering an area of about one-fourth of an acre at the place where the water stood on the above mentioned occasion in the spring of 1936, but which pond "fell in" and disap-

peared, and the land at that place is now cultivated profitably by complainants.

There is undisputed evidence which indicates that all of the water which flooded complainants' land on the occasion above mentioned did not come down that section of the Hickory Valley Road adjacent to defendants' lands, but that at least a portion of it entered the Hickory Valley Road south of defendants' lands. Complainants have a road, or "lane," between their land and defendants' land, leading west and northwest from the Hickory Valley Road to complainants' woodlands, and complainants maintain a log barrier at an appropriate place on the south margin of this lane to keep the water from flooding their field south of the lane, but the map filed by complainants shows that the ditch on the west side of the Hickory Valley Road, at the mouth of complainants' said lane, is "filled in," which would naturally cause the waters flowing down complainants' said lane to cross the Hickory Valley Road to its east side, and, as the mouth of complainants' lane is some distance north of the point where complainants' land was flooded as aforestated, the conclusion is practically inescapable that the waters flowing down complainants' said lane contributed to the flooding of complainants' land.

The record affords no basis for an ascertainment of the proportion of the waters which came down complainants' lane as compared with the waters which came down the Hickory Valley Road from above the "rise" at defendants' south line; but it appears that complainants' said lane is of considerable length, that the volume of water flowing down the lane is sufficient to make it desirable for complainants to maintain a log barrier to keep it out of their field, and that the complainants' map shows a "large hollow that flows water to lane."

Defendant Joe Mitchell testified that the water went over the "rise" in the Hickory Valley Road on the occasion mentioned (in the spring of 1936) instead of flowing into the sinks on his fields, because of the fact that the "road people" threw some brush in the road ditches which caused an obstruction in the flow of the water from the road into his fields. This testimony is substantially undisputed.

Complainants have not established a prescriptive right to have the water that now flows down the Hickory Valley Road diverted into the defendants' fields. "To establish an easement by prescription there must be: first, continued and uninterrupted use or enjoyment; second, identity of the thing enjoyed; third, a claim of right adverse to the owner of the soil, known to and acquiesced in by him." 9 R. C. L., page 772, sec. 33.

To entitle a person to an easement by prescription he must show that he has used the right for the prescriptive period (twenty years

in Tennessee) without change or material variation. "The user relied upon must not only be of the same general character, but must have been exercised substantially to as great an extent as at the time the suit is brought." 9 R. C. L., pp. 775, 776, sec. 35.

The burden is on him who asserts a prescriptive right to show, not only the user, but that it was exercised adversely and under a claim of right. "And the user relied upon must not only be of the same general character, but must have been exercised substantially in as offensive a degree and to as great an extent as at the time the suit is brought." Smith v. Sedalia, 152 Mo. 283, 53 S. W., 907, 910, 48 L. R. A., 711, 715, citing, inter alia, Wood on Limitations, sec. 182.

Complainants had owned their lands involved in this case for about eleven years at the time this suit was brought. There is no proof that their predecessors in title at any time claimed the right to have the waters which flowed down the Hickory Valley Road ditches diverted into defendants' fields, or that complainants themselves claimed such right until the spring of 1936; hence there is no proof of an adverse user sufficient to establish a prescriptive right to such an easement. A prescriptive right "being founded upon the supposition of a grant, must necessarily be exercised or made use of in such a way as to indicate that it is claimed as a right." Davis v. Louisville & N. Railroad Co., 147 Tenn., 1, 8, 244 S. W., 483, 485; 67 C. J., page 886, sec. 310.

Moreover, it is necessarily true that each of the numerous lateral ditches north of defendants' lands increased the volume of water flowing down the ditches of the Hickory Valley Road, and the proof does not show when any one or more of these several lateral ditches were made; hence it does not appear that the alleged prescriptive right claimed by complainants has been exercised for twenty years substantially to the same extent as at the time this suit was brought.

In the absence of a prescriptive right, the case must be decided upon the principles governing the reciprocal rights and duties of adjacent land owners with respect to surface waters, which we have hereinbefore stated. We find that defendants have done nothing, and have not threatened to do anything, that will unlawfully divert the surface water from flowing in its accustomed manner. They were within their rights in building the barrier described in the record (with the opening therein), at their property line along the Hickory Valley Road to protect their cultivated land and crops from the waters which had been concentrated in the road ditches and thus sent down in unnatural quantities by others for whose acts defendants were not responsible.

As said by the court in Kauffman v. Griesemer, 26 Pa., 407, 67 Am. Dec., 437, 441: "The plaintiffs had no right to insist upon his

receiving waters which nature never appointed to flow there; and against any contrivance to reverse the order of nature. he might peaceably and on his own land take measures of protection. The sod dam, if indeed it ever had a substantive existence, of which the counsel on neither side were able to convince themselves, was in this view of the case, an innocent and lawful erection. It was not setting up a nuisance against a nuisance, any more than the shutting the door against an unwelcome visitor is a nuisance. The only servitude the plaintiffs could claim in the defendant's land was that it should receive the overflow which was natural and customary.''

However, the defendants have assumed the burden of permitting, and providing for, the diversion to the sinks on their lands of all the waters that come down Hickory Valley Road to their premises under ordinary normal conditions, such as may be reasonably anticipated, by the gap or opening in the wall, and the ditch therefrom to the sink in their field on the east side of the road, and by ditching the water from the west side of the road to the sinks in their field on that side.

Defendant Joe Mitchell testified, in substance, that, although he had at one time tentatively considered a plan to build a barrier on the west side of the Hickory Valley Road, he had abandoned such plan, and had no purpose to build such barrier. It also appears that, in his conversation with the complainants concerning the prospective construction of a wall on the west side of the road, defendant Joe Mitchell stated that it was his purpose to leave an opening in such wall if built, to divert the water from the road ditch to the sink or sinks in his field.

It is seen that, in his decree hereinbefore copied, the Chancellor found that the opening in defendants' dam or wall on the east side of the road, 5 feet wide with a wire fence across the opening, ''will probably accommodate all of the surface water flowing down that side of said road, provided said hole or opening is kept open and not permitted to become clogged and obstructed by debris and rubbish of various kinds, but that if it is permitted to become so congested and stopped up that it will not accommodate said water and that said water will flow over onto complainants' lands;'' and the Chancellor granted a mandatory injunction requiring and directing the defendants ''to keep said hole or opening open, free and unobstructed at all times so that said surface water will be allowed free and unobstructed passage through said opening at any and all times.''

As before stated, the appellants assign the granting of such mandatory injunction as error.

''Courts do not look with favor on mandatory injunctions, and they will rarely be granted.'' Growers Warehousing Corp. v.

Sawyers Tobacco Co., 5 Tenn. App., 619, 625, and authorities there cited.

A mandatory injunction will not be granted except in extreme cases, and when courts of law are unable to afford adequate redress, or when the injuries complained of cannot be compensated in damages. Post v. Southern Railroad Co., 103 Tenn., 184, 216, 52 S. W., 301, 55 L. R. A., 481; Union Planters' Bank & Trust Co. v. Memphis Hotel Co., 124 Tenn., 649, 658, 139 S. W., 715, 39 L. R. A. (N. S.), 580.

But there is a further and conclusive reason for denying the mandatory injunction granted by the court below in this case, viz.: the court will not "by a mandatory injunction, undertake to enforce the performance of continuous duties." Gibson's Suits in Chancery (4 Ed.), sec. 825; 2 Dan. Chan. Prac., 1663.

It results that the appellants' assignments of error are sustained, and a decree will be entered here reversing the decree of the Chancery Court, dissolving the injunctions, both prohibitory and mandatory, and dismissing complainants' bill.

The costs of the cause, including the costs of the appeal, will be adjudged against the appellees, W. W. Slatten and Quill Little, and the sureties on their cost bond in the court below. Gulf Refining Co. v. Frazier, 15 Tenn. App., 662, 704.

Crownover and Felts, JJ., concur.