WOODLAWN MEMORIAL PARK OF NASHVILLE, INC.

v.

L & N RAILROAD CO., INC.

Civ. A. No. 5060.

United States District Court, M. D. Tennessee, Nashville Division.

March 10, 1972.

14. Levin v. Mississippi River Corp., 59 F.R. D. 353, 366 (S.D.N.Y.1973).

F. Clay Bailey, Jr., Nashville, Tenn., for plaintiff.

David M. Keeble, Nashville, Tenn., for defendant.

## MEMORANDUM

MORTON, District Judge.

This suit was brought by Woodlawn Memorial Park (hereinafter referred to as "Cemetery") against the Louisville & Nashville Railroad Company (hereinafter referred to as "Railroad"), for damages allegedly caused by the collection and diversion of rainfall on the railroad property in such a manner as to cause water to flow into and onto the adjacent Cemetery property in greater quantities and at a place other than the normal drainage shed.

The Cemetery and Railroad properties are contiguous, the property of the Railroad lying on the east side of the Cemetery's property. The Railroad property is bounded on the south by Thompson Lane, while the Cemetery property extends across Thompson Lane.

The Cemetery property, being lower in elevation, has served as a drainage area for more than two hundred adjacent acres, including the Railroad property. Prior to 1952, the properties of the Cemetery and the Railroad were undeveloped, with the natural drainage thereon being relatively undisturbed, except that a drain tile installed by the City of Nashville under Thompson Lane carried surface water from the area south and east of the Railroad property and dumped it onto the Railroad property. From the point of its entrance onto the Railroad property, the water followed a small valley, i. e., a natural drainage channel, in a northwesterly direction to and onto the property of Cemetery. It then continued in a northwesterly direction over the Cemetery property through a large ditch or dry creek. In addition to the water channeled onto the Railroad property by the aforementioned 36-inch drain tile under Thompson Lane, there was a natural drainage from the Railroad property westerly to the Cemetery property. This immediate drainage area was approximately 5½ acres, fronting on the Cemetery property a distance of approximately 800 feet.

In 1952 or 1953 the Cemetery, desiring to extend its burial grounds, installed an underground drainage system. In so doing, the Cemetery raised the elevation of its property approximately six feet where it joined the Railroad property. In raising the elevation, the Cemetery created a catch basin at the boundary line between the two properties. This catch basin directed the water in a westerly direction for a distance of about 200 feet to a 42-inch drainage tile. This drainage tile conveyed the water to a larger tile which ran under the Cemetery property. The Cemetery eliminated the above-ground natural drainage ditch or dry creek. However, the Cemetery property in question remained lower in elevation than the Railroad property.

Between 1952 and 1966, substantial commercial and industrial development had occurred in the drainage area south and east of the Railroad property. As a result of this commercial and industrial development, there was an increased amount of surface water. This water was channeled onto the Railroad property by means of the 36-inch drain tile under Thompson Lane, by overflow from Thompson Lane during heavy rains, and by drainage from property east of and adjacent to the Railroad property. Some of this water collected in the natural valley or drain on the Railroad property, spilled into the Cemetery-built catch basin, and escaped through the 42-inch drain tile which ran through and under the Cemetery property. Other portions of the surface water drained by unchanneled flow from the Railroad property onto the Cemetery property.

In 1966 the Railroad disturbed the natural contours of its land by grading and leveling a large portion of its land, including the 5½ acre drainage area and the natural drainage ditch. This 5½ acre tract was raised in elevation some six to ten feet, with a finished grade or slope of one per cent. (The amount of slope prior to grading was substantially greater than one per cent.) The grading terminated some six to ten feet from the Cemetery property with an abrupt embankment or dropoff of six to ten feet.

The course of the natural drainage ditch on the Railroad property was changed and lengthened and given a more abrupt angle, resulting in the slowing of the speed of the water flow. This new drainage ditch began at the 36-inch drain tile under Thompson Lane and terminated at the Cemetery catch basin. The lines of the new drainage ditch and the original drainage ditch would, if viewed together, form roughly a right triangle, with the old drainage ditch constituting the hypotenuse of the triangle. The result of the change was the slowing of the speed of the flow of the water.

In addition, the Railroad constructed a road running roughly parallel to the east line of the Cemetery property, and located in the approximate center of the 5½

acre tract. This road constituted a barrier or break of the flow from a portion of the Railroad property westward to the Cemetery property.

On or about June 28, 1967, a heavy and intense rain fell in the Nashville, Tennessee area. This rain was described in the following language by the Weather Bureau, United States Department of Commerce:

"A series of strong thunderstorms brought local flooding of streets in downtown Nashville, inundating several trucks and automobiles. Storm rainfall totals varied from one to five inches. The public reported six inches in West Nashville." (Exhibit E)

Four rain gauges were located in the general area of the plaintiff's and defendant's properties. Two of these rain gauges gave the following readings:

*Berry Lane gauge* (located 4,000 to 5,000 feet from property)

2.85 inches of rain fell between 12:15 p. m. and 2:40 p. m.

The intensities were:

```
1:20 p. m. to 1:25 p. m.—8.4 inches per hour
1:15 p. m. to 1:25 p. m.—7.2 inches per hour
1:10 p. m. to 1:25 p. m.—6.4 inches per hour
1:10 p. m. to 1:30 p. m.—5.4 inches per hour
```

*Fairgrounds gauge* (located 5,000 feet from the property)

2.88 inches of rain fell between 12:20 p. m. and 5:05 p. m.

The intensities were:

```
1:30 p. m. to 1:35 p. m.—7.44 inches per hour
1:25 p. m. to 1:40 p. m.—6.16 inches per hour
```

The United States Weather Bureau indicates that rainfall at a rate of 5.4 inches per hour, lasting twenty minutes, or at a rate of 6.16 inches per hour, lasting fifteen minutes, would be exceeded on the average of once in 100 years at any specific location in Nashville.

All of the foregoing recitations are found as fact by the court.

As a result of this heavy rainfall, the surface water from the drainage area, including that from the property south and east of the Railroad property, inundated the Cemetery property, causing caskets and vaults to float out of the ground. The affected cadavers were re-embalmed and re-interred, resulting in economic loss to the Cemetery. In addition, the Cemetery allegedly suffered a loss of sales due to the publicity of the dislocations caused by the flooding.

The court makes these additional specific findings of fact:

(1) The Railroad, by changing the direction of the channel for water entering its property at the 36-inch drain tile under Thompson Lane, did not in any manner increase the amount of water or concentrate the water flowing onto the Cemetery property. In fact, by the design of the new drainage ditch, it decreased the speed of the water flow onto the Cemetery property.

(2) Any increase in the quantity of water flowing onto the property of the Railroad from the 36-inch drain tile, the overflow of Thompson Lane, or from the south and east of the Railroad property was not caused or contributed to by any action of the Railroad. Any such increase was due to the development by adjoining property owners who are not parties to this action.

(3) By leveling its property, the Railroad did not increase the area of its property from which surface water flowed onto the property of Cemetery.

(4) After leveling its property, the slope of the Railroad property toward that of the Cemetery was one per cent. Before leveling, the property had a substantially higher degree of slope.

(5) After leveling, surface water drained toward the Cemetery property uniformly and entered over a length of approximately 800 feet. There was no channeling of the surface water.

(6) Due to the content of the fill and the method used in making the fill, no loss of absorption resulted; instead, the degree of water absorption on the Railroad property increased.

(7) That portion of the underground drainage system as designed and placed in the Cemetery property to carry the

water from the Railroad property was insufficient to carry off the water which falls during a storm of the intensity as that which occurred on June 28, 1967. Thus, without any grading by Railroad, the system would not have been adequate to prevent the flooding of Cemetery property on June 28, 1967.

(8) Any pooling of water backup at the property line between the Cemetery and the Railroad was caused by Cemetery when it closed the natural drain or creek and installed the underground drainage system.

## APPLICABLE LAW

■ "The general rule is stated to be, that the owner of the higher land, for instance, has no right, even in the course of use and improvement of his land, to collect the surface water into a drain or ditch, increasing it in quantity or in a manner different from the natural flow upon the lower lands of another, to the injury of such lands." Dixon v. City of Nashville, 29 Tenn. App. 282, 203 S.W.2d 178 (1946); Slatten v. Mitchell, 22 Tenn.App. 547, 124 S.W.2d 310 (1938).

■ "[I]f the proprietor of the higher lands alters the natural condition of his property, and collects the surface and rainwater together at the bottom of his estate and pours it in a concentrated form and in unnatural quantities upon the land below, he will be responsible for all damages thereof caused to the possessor of the lower lands." Dixon v. City of Nashville, supra; Garland v. Aurin, 103 Tenn. 555, 53 S.W. 940 (1899); Slatten v. Mitchell, supra; Tyrus v. Kansas City, Ft. S. & M. R. Co., 114 Tenn. 579, 86 S.W. 1074 (1905).

■ "A wrongful interference with the natural drainage of surface water causing injury to an adjoining landowner constitutes an actionable nuisance." Dixon v. City of Nashville, supra.

■ "Any substantial or essential interference with the flow, if wrongful, whether attended with actual damage or not, is an actionable nuisance." Talley v. Baker, 3 Tenn.App. 321 (1926).

■ "[D]efendants are not responsible for injuries which may be sustained by complainants, caused by water diverted from its natural flow and into the road ditches by others for whose acts neither of the parties is responsible . . . ." Slatten v. Mitchell, supra.

■■ "[T]he 'common enemy' doctrine that each landowner may fight off surface water and dispose of it as best he can does not obtain in this State, citing numerous Tennessee cases, and that in disposing of surface water the rights of adjoining owners must be respected." Dixon v. City of Nashville, supra; Slatten v. Mitchell, supra.

■ "All lands . . . are of necessity burdened with the servitude of receiving and discharging all waters which flow down to them from higher lands." Slatten v. Mitchell, supra.

■ "The rule that lands lying at a lower level are burdened with the servitude of receiving all waters which naturally flow down to them from lands adjoining, and upon a higher level, has in this state been adopted, and applied, not only to living streams, springs, etc., but also to surface water, and waters falling as rain or snow upon such higher lands." Louisville and Nashville R. Co. v. Mossman, 90 Tenn. 157, 16 S.W. 64 (1891); Davis v. Louisville and Nashville R. Co., 147 Tenn. 1, 244 S.W. 483 (1922).

■ "[T]he proprietor may . . . protect his lands from the injurious effects of surface water, if, in thus relieving himself, he respects the rights of others." Slatten v. Mitchell, supra.

See also 23 Tenn.L.Rev. 797 at 815–818 (1955) for a summary of the law of Tennessee and surrounding states as to diffused surface waters.

## CONCLUSIONS

1. The change in the course of the drainage ditch and/or the grading and leveling of its property by the Railroad did not cause the flooding of the Cemetery property.

2. Without any alterations of its property by Railroad, the underground drainage system of the Cemetery would not have been adequate to prevent the flooding of Cemetery property on June 28, 1967.

3. Any loss suffered by the Cemetery was caused by the increase in surface water in the drainage area south and east of the Railroad property caused by the surrounding commercial and industrial development and the inadequacy of the Cemetery underground drainage system to accommodate the heavy and intense rainfall of June 28, 1967.

An appropriate order will be entered dismissing this action.